## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

KIRBY DEVELOPMENTS LLC,                  :      Case No: 2:18-cv-00500
                                         :
               Plaintiff,       :
                                         :
v.                                       :
                                         :
XPO GLOBAL FORWARDING, INC.              :
d/b/a XPO GLOBAL LOGISTICS, INC.         :
AND XPO LOGISTICS; MIDWEST               :
COAL, LLC; MID AMERICA TIRE OF           :
HILLSBORO, INC. d/b/a BEST-ONE           :
TIRE & SERVICE OF HILLSBORO, AFIF        :
BALTAGI; JOHN ECKERD; TODD               :
WILKIN; L.A.D. IMPEX                     :
CORPORATION; and AHMET NEIDIK,           :
                                         :
               Defendants.      :

## COMPLAINT

Now comes Plaintiff, Kirby Developments LLC ("Plaintiff" or "Kirby"), and hereby files this Complaint against Defendants, XPO Global Forwarding, Inc. d/b/a XPO Global Logistics, Inc. and XPO Logistics ("XPO"), Midwest Coal, LLC ("Midwest"), Mid America Tire of Hillsboro, Inc. d/b/a Best-One Tire & Service of Hillsboro ("Mid America"), Afif Baltagi ("Baltagi"), John Eckerd ("Eckerd"), Todd Wilkin ("Wilkin"), L.A.D. Impex Corporation ("LAD"), and Ahmet Neidik ("Neidik"), and hereby states as follows:

## INTRODUCTION

1.     Kirby is one of several victims of Defendants' organized scheme to defraud companies and individuals out of millions of dollars through fraudulent off-the-road mining tire transactions.  Beginning in October 2015, Defendants fabricated fraudulent documents, made intentional misrepresentations, and otherwise conspired to defraud Kirby out of $6,691,000.00.

1

2. Defendants have conspired multiple times using the same fraudulent off-the-road tire investment or sales scheme leading to the following suits, among others:

      a. *Abington Emerson Capital, LLC vs. Jason Adkins, et. al.*, S.D. Ohio Case No. 2:17-cv-00143;

      b. *Great Southland Limited v. Landash Corporation, et al.*, S.D. Ohio Case No. 2:17-cv-00717;

      c. *Bruce Hann, et al. v. Landash USA, Corp. et al.*, Ohio Ct. of Cmn. Pleas, Jackson Cty. Case No. 17 CIV 0114;

      d. *Smithfield Financing Group II LLC v. Landash Corporation, et al.*, Ohio Ct. of Cmn. Pleas, Jackson Cty., Case No. 15 CIV 0112.

3. Judgment against Defendants is necessary to restore Kirby to its previous position, punish Defendants, and to prevent future victims of Defendants' continuing organized scheme.

## THE PARTIES

4. Plaintiff Kirby is a West Virginia limited liability company with its principal place of business at 130 Meadow Ridge Road, Mt. Morris, Pennsylvania 15349.

5. Defendant XPO is a Delaware corporation with its principal place of business in Illinois.

6. Defendant Midwest is an Ohio limited liability company with its principal place of business in Ohio.

7. Defendant Mid America is an Ohio corporation with its principal place of business in Hillsboro, Ohio.

8.      Defendant Baltagi is an individual residing at 2308 Nantucket Drive, Apt. C Houston, Texas 77057.   Baltagi is the branch manager of an XPO warehouse located at 4513 Oates Road, Houston, Texas 77013.

9.      Defendant Eckerd is an individual residing at 1801 Provine Court, McKinney, Texas 75070.

10.     Defendant Wilkin is an individual residing at 106 Newkirk Drive, Hillsboro, Ohio 45133.   Wilkin is the principal of Mid America.

11.     Defendant LAD is a Delaware corporation with its principal place of business at 1 Bridge Plaza North, Suite 275, Fort Lee, New Jersey 07024.

12.     Defendant Neidik is the principal of LAD and its alter ego and he resides in New Jersey.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction in this matter pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship between Kirby, a West Virginia limited liability company with its principal place of business in Pennsylvania, and all of the Defendants and the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

14.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1337 as Kirby has pled claims pursuant to 18 U.S.C. § 1964(c) that are also related to the state law claims in this action in that they form part of the same case or controversy under Article III of the United States Constitution.

15.     Venue is proper in the Southern District of Ohio pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Kirby's claims occurred in this district or pursuant to 28 U.S.C. § 1391(b)(3) as there is no district in which an

3

action may otherwise be brought and every defendant is subject to the personal jurisdiction of this Court.

## FACTS

### *The Off-the-Road-Mining-Tire Investment Opportunity*

16.     In October 2015, Eckerd contacted one of Kirby's two members, Scott Kiger ("Kiger"), a childhood acquaintance, regarding an investment opportunity buying and selling off-the-road, heavy-duty mining tires ("OTR Tires"). Kiger asked O'Connor Group L.P. (hereinafter "O'Connor") and its principal, John O'Connor, to work with Eckerd regarding the opportunity.

17.     On October 26, 2015, Eckerd emailed O'Connor several documents outlining the OTR Tire investment opportunity. Eckerd attached an OTR Tire transaction guide, an article regarding OTR Tire Manufacturing, a blank OTR Tire Procurement Agreement, a balance sheet for proposed partner Midwest, and an independent accountant's compilation report for Midwest. A true and correct copy of the Eckerd Email to O'Connor, dated October 26, 2015, is attached hereto as **Exhibit "A."**

18.     Eckerd's OTR Tire transaction guide falsely represented the following, among other things: (1) Eckerd had several buyers lined up to buy OTR Tires; (2) OTR Tires would be purchased from Mid America; (3) Midwest was the company that he usually did deals with involving Mid America; (4) a typical OTR Tire transaction required an upfront payment and in most cases the parties used a bonded freight forwarder to act as an escrow agent; and (5) the OTR tires were typically transported to Baltimore, Miami, or Houston and stored in a bonded freight forwarder distribution center. The guide also included a table listing several OTR Tires that Kirby would ultimately purchase. A true and correct copy of Eckerd's OTR Tire transaction guide is attached hereto as **Exhibit "B."**

4

19.     Eckerd's sample OTR Tire Procurement Agreement included an example Warehouse Receipt, Bill of Sale, and Warehouse Release Letter. A true and correct copy of Eckerd's sample OTR Tire Procurement Agreement is attached hereto as **Exhibit "C."**

20.     Eckerd arranged a meeting at a Cracker Barrel restaurant in Ohio on or about October 29, 2015 between Kiger, Kirby's other member Charlie Riggs ("Riggs"), O'Connor, and Jason Adkins ("Adkins"), the principal of Midwest. Eckerd represented to and assured Kiger, Riggs, and O'Connor that Adkins was trustworthy and a legitimate businessman.

21.     At the meeting, Adkins claimed to have experience buying OTR Tires in the United States and selling them for a significant profit to overseas mining companies. Adkins represented that any purchased OTR Tires could be sold in three to six months to a buyer in Australia named Giant Tyre Service PTY Ltd ("Giant Tyres").

22.     Adkins initially asked Kiger, Riggs, and O'Connor to loan Midwest money to help it finance the purchase of the OTR Tires. Kiger, Riggs, and O'Connor, however, requested that Kirby purchase and take ownership of the OTR Tires and, with Adkins' assistance, complete the sale of the OTR Tires from Kirby to Giant Tyres.

23.     After several additional meetings and telephone conversations primarily between Adkins and O'Connor, Kiger, O'Connor, Riggs, and Adkins agreed to collaborate in purchasing and selling OTR Tires. Kirby agreed to invest $6,691,000.00 to purchase OTR Tires and Adkins, through Midwest, agreed to contribute $600,000.00 and 54 already owned OTR Tires with an alleged value of $2,784,00.00 (the "initial 54 OTR Tires"). Under the parties' agreement, the OTR Tires would be purchased and owned by Kirby and the proceeds of the sale to Giant Tyres would be split between the parties.

24. On November 12, 2015, before proceeding with the deal, Kirby, through O'Connor, required that Midwest send its 2014 tax return, a list of all the OTR Tires that were part of the initial 54 OTR Tire transaction, including the size, cost, and serial number of each OTR Tire, proof that the initial 54 OTR Tires had been purchased and were owned by Midwest, copies of any documents Midwest had regarding its proposed freight forwarder, LAD, and the contact information for XPO, the entity that Adkins represented to Kiger and O'Connor held the initial 54 OTR Tires in storage. A true and correct copy of the O'Connor Email to Adkins, dated November 12, 2015, is attached hereto as **Exhibit "D."**

25. On November 12, 2015, Adkins sent emails to O'Connor containing Midwest's tax returns, financials, and a list of the initial 54 OTR Tires that Midwest purportedly purchased and owned. True and correct copies of the Adkins Emails to O'Connor, dated November 12, 2015, and the fraudulent attachments thereto, are attached hereto as **Exhibit "E."**

26. On November 13, 2015, Adkins sent an email to O'Connor containing screenshots of his phone purportedly evidencing two wire transfers between Midwest and LAD, the freight forwarder, for the purchase of the initial 54 OTR Tires. The first wire transfer, on October 28, 2015, was for $500,000.00, and the second wire transfer, on November 4, 2015, was for $2,284,000.00. A true and correct copy of the Adkins Email to O'Connor, dated November 13, 2015, is attached hereto as **Exhibit "F."**

27. Adkins also introduced O'Connor to Baltagi via email on November 12, 2015 and indicated that OTR Tires were in transit to XPO's facility in Houston. Baltagi represented himself as the Branch Manager of XPO's facility in Houston and O'Connor and Baltagi set up a conference call for November 13, 2015. A true and correct copy of the Adkins, Baltagi and O'Connor Email, dated November 12, 2015, is attached hereto as **Exhibit "G."**

6

28.    On November 13, 2015, prior to any payment by Kirby for the OTR Tires, XPO, through its duly-authorized employee Baltagi, again verified in a conference call with O'Connor and other Kirby representatives that he was the Branch Manager of XPO's facility in Houston. XPO, through Baltagi, also represented that the initial 54 OTR Tires were in storage at XPO's Houston facility.  XPO's storage of the 54 OTR Tires at its Houston facility was confirmed by Baltagi in a November 19, 2015 email.  A true and correct copy of the Baltagi Email, dated November 19, 2015, is attached hereto as **Exhibit "H."**

29.    Based on the documentation and representations provided by Eckerd, Midwest, through Adkins, XPO, through Baltagi, and LAD, Kirby agreed to go forward with the OTR Tire transaction proposed by Adkins and Midwest.

### The OTR Agreement

30.    On November 17, 2015, Kirby, O'Connor, and Midwest entered into the OTR Tire Purchase and Resale Agreement (hereinafter "the OTR Agreement").  A true and correct copy of the OTR Agreement is attached hereto as **Exhibit "I."**

31.    As proposed, the OTR Agreement called for Kirby, Midwest, and O'Connor to make specified contributions to fund Kirby's purchase and resale of certain OTR Tires.  Ex. I, p. 1,  ¶  2.    Kirby's two members contributed  $5,691,000.00,  O'Connor  contributed $1,000,000.00, and Midwest was to contribute $3,384,000.00.  Ex. I, Schedule 2.

32.    Midwest's contribution of $3,384,000.00 included the cost of the initial 54 OTR Tires and $600,000.00 in cash which Adkins and Midwest represented would be paid directly to LAD to be used toward the purchase of additional OTR Tires.  Ex. I, Schedule 2, n. 1.

33.    Upon Midwest receiving Kirby's confirmation that it held all contributions from the parties, Midwest was to undertake to complete the purchase and resale of the OTR Tires for

the mutual benefit and gain of the parties, utilizing freight forwarders, warehousemen and transportation companies acceptable to the parties. Ex. I, p.2, ¶ 3.

34. Midwest's obligations under the OTR Agreement included: (i) coordinating transportation and delivery of the OTR Tires to the designated port; (ii) inspecting the OTR Tires at the XPO warehouse to confirm they conformed with specifications; (iii) protecting the OTR Tires from risk of loss, damage, or theft; (iv) insuring the OTR Tires; (v) ensuring that title to the OTR Tires, including the already purchased initial 54 OTR Tires, vested in Kirby free and clear of all liens and encumbrances from the time of purchase to the resale; (vi) soliciting non-affiliated third party buyers for the OTR Tires and reselling them to such buyers; (vii) delivering the OTR Tires to the buyers after Kirby received the entire sales price and notified Midwest in writing that Midwest may release the OTR Tires to the buyer; and (viii) any other necessary actions requested by Kirby in connection with OTR Tire transactions. Ex. I, p.2, ¶ 3.

35. Upon Kirby receiving confirmation from Midwest that all matters necessary to complete the purchase of the OTR Tires were complete, including confirmation that the OTR Tires were received by XPO, the agreed upon warehouse intermediary, at its Houston facility and were inspected by Midwest and in good and merchantable condition, Kirby was to authorize LAD to distribute the funds that Kirby wired to it. Ex. I, p.1, ¶ 2.

### *Mid America, LAD, XPO, and the Purported Purchase of the Initial 54 OTR Tires*

36. Midwest, through Adkins, identified Mid America as the purported seller of the initial 54 OTR Tires that Midwest was contributing to Kirby and, as Eckerd represented, the seller of additional OTR Tires to be purchased by Kirby under the OTR Agreement.

37. Upon Midwest's and Adkins' insistence, Kirby agreed to allow LAD to act as the escrow agent and freight forwarder for the transactions under the OTR Agreement. Based on

Midwest's representation, through Adkins, Kirby agreed to wire the funds to purchase the OTR Tires to LAD.  LAD was not to release any funds to Mid America (the purported seller of the OTR Tires) until it received authorization from Kirby.

38.    LAD is owned by Neidik and controlled by Adkins and Neidik.

39.    Pursuant to the above-referenced OTR Agreement and prior communications with XPO, Kirby also agreed to use XPO to store the OTR Tires it purchased at XPO's warehouse facility located at 4513 Oates Road, Houston, Texas 77013 (hereinafter the "XPO Facility") from which the OTR Tires could be shipped to buyers arranged by Midwest, LAD and/or Adkins and subsequently designated by Kirby.  See "Client Shipping Agreement," a true and correct copy of which is attached hereto as **Exhibit "J."**

40.    At Adkins' and Midwest's urging, the parties used the initial 54 OTR Tires as an illustration for future transactions involving Kirby's purchase and resale of OTR Tires.

41.    In order to obtain Kirby's confidence in and reliance on the purchase of OTR Tires through Mid America, Midwest provided Kirby with evidence of two wire transfers from Midwest to LAD totaling $2,784,000.00 dated October 28, 2015 and November 4, 2015 that were purportedly used to purchase the initial 54 OTR Tires from Mid America that Midwest was contributing to Kirby.  See Ex. F.

42.    To further gain Kirby's confidence and entice Kirby to wire money to LAD, on November 18, 2015, Mid America and its principal Wilkin prepared Work Order 1-67650 covering the initial 54 OTR Tires allegedly sold to Midwest for $2,784,000.00.  In Work Order 1-67650, Mid America and Wilkin represented that Midwest had paid Mid America in full for the 54 OTR Tires.  Mid America, through Wilkin, also provided two Bills of Sale transferring title, free and clear of all liens, of the initial 54 OTR Tires to Kirby, all identified by make,

model and specific serial number. A true and correct copy of Work Order 1-67650 is attached hereto as **Exhibit "K."** True and correct copies of the Bills of Sale are attached hereto as **Exhibit "L."**

43. To complete the fraud on Kirby, Mid America, through Wilkin, also signed two Seller's Warehouse Release Letters directed to Baltagi and XPO, the alleged holder of the initial 54 OTR Tires, advising XPO that the initial 54 OTR Tires had been sold to Kirby and directing XPO to take all further instructions regarding the 54 OTR Tires from Kirby. True and correct copies of the Seller's Warehouse Release Letters are attached as **Exhibit "M."**

44. Upon information and belief, all of the Work Orders, Bills of Sale, Warehouse Release Letters and wire transfers regarding the initial 54 OTR Tires were prepared by or at the direction of Adkins and Midwest with the knowledge, agreement, and complicity of Eckerd, Niedik, LAD, Baltagi, XPO, Wilkin, and Mid America.

45. The documentation and communications described above were part of a well-orchestrated fraudulent scheme by Defendants collectively to induce Kirby to wire its $6,691,000.00 to LAD.

*Kirby Wires Money to LAD for the Purchase of OTR Tires*

46. Prior to Kirby wiring money to LAD, Kirby, through O'Connor, travelled to the XPO Facility in Houston to confirm that XPO actually held OTR Tires in sufficient quantity for Kirby to purchase. At the XPO Facility, Baltagi and Adkins showed O'Connor 300 to 400 OTR Tires with serial numbers and assured him that Kirby would own most of these OTR Tires after it transferred the money to LAD.

47.     XPO, through Baltagi, also assured Kirby and O'Connor that Adkins, Neidik, Midwest, and LAD were trustworthy and that XPO had previously conducted business with both individuals and both companies.

48.     On November 20, 2015, relying on the documents and assurances described above, Kirby wired $2,100,000.00 to LAD for the purchase of 48 OTR Tires from Mid America pursuant to Work Order 1-67651, which totaled $2,700,000.00.  A true and correct copy of the November 20, 2015 Wire Transfer is attached hereto as **Exhibit "N."**  A true and correct copy of Work Order 1-67651 is attached hereto as **Exhibit "O."**

49.     Mid America, through Wilkin, provided two Bills of Sale transferring title, free and clear of all liens, of the 48 OTR Tires to Kirby, all identified by make, model and specific serial number.  Mid America, through Wilkin, also signed two Seller's Warehouse Release Letters directed to XPO, the holder of the 48 OTR Tires, informing XPO that the 48 OTR Tires were sold to Kirby and directing XPO to take all further instructions regarding the 48 OTR Tires from Kirby.  True and correct copies of the Bills of Sale are attached hereto as **Exhibit "P."** True and correct copies of the Seller's Warehouse Release Letters are attached hereto as **Exhibit "Q."**

50.     Per the OTR Agreement, Midwest allegedly had already wired the remaining $600,000.00 owed on Work Order 1-67651 directly to LAD and, as evidence thereof, Midwest, through Adkins, sent O'Connor a screenshot of Midwest's wire to LAD.  A true and correct copy of the Adkins Email, dated November 18, 2015, is attached hereto as **Exhibit "R."**

51.     On November 20, 2015, XPO representative Baltagi sent an email to O'Connor and Midwest, which contained two Non-Negotiable Warehouse Receipts and several

photographs of the OTR Tires and the XPO Facility. A true and correct copy of the Baltagi Email to O'Connor and Adkins, dated November 20, 2015, is attached hereto as **Exhibit "S."**

52.     XPO, through Baltagi, executed the Non-Negotiable Warehouse Receipts accepting delivery of the initial 54 OTR Tires and the newly purchased 48 OTR Tires, certifying receipt of the tires into storage at the XPO Facility and expressly confirming XPO's obligations to Kirby as follows:

> Delivery will be made to the person designated upon order of Kirby Development LLC. The terms of this Receipt governs the relationship between the parties to the sale of the above listed items and XPO Global Logistics and supersede any terms on any other bill of lading, delivery order, or warehouse receipt.

See November 20, 2015 Warehouse Receipts (Non-Negotiable), true and correct copies of which are attached hereto as **Exhibit "T."**

53.     On November 30, 2015, Kirby wired $2,331,020.00 to LAD for the purchase of 48 more OTR Tires from Mid America pursuant to Work Order 1-67684.  Mid America, through Wilkin, again provided a Bill of Sale identifying the 48 OTR Tires by make, model and specific serial number and executed a Seller's Warehouse Release Letter directed to XPO.  XPO, through Baltagi, then sent Kirby a signed Non-Negotiable Warehouse Receipt certifying that XPO had the 48 OTR Tires at the XPO Facility.  True and correct copies of Work Order 1-67684 and the related Bill of Sale, Seller's Warehouse Release Letter, and Non-Negotiable Warehouse Receipt are attached hereto as **Exhibit "U."**

54.     On December 11, 2015, Kirby wired $1,056,000.00 to LAD for the purchase of 24 more OTR Tires from Mid America pursuant to Work Orders 1-68368 and 1-68369.  Again, Mid America, through Wilkin, provided to Kirby a Bill of Sale identifying the 24 OTR Tires by make, model and specific serial number and executed a Seller's Warehouse Release Letter

directed to XPO.  XPO, through Baltagi, sent a signed Non-Negotiable Warehouse Receipt to Kirby certifying that XPO had the 24 OTR Tires at the XPO Facility.  True and correct copies of Work Orders 1-68368 and 1-68369 and the related Bill of Sale, Seller's Warehouse Release Letter, and Non-Negotiable Warehouse Receipt are attached hereto as **Exhibit "V."**

55.     On January 12, 2016, Kirby wired $1,203,980.00 to LAD for the purchase of 26 more OTR Tires from Mid America pursuant to Work Order 1-69067.  Mid America, through Wilkin, again provided to Kirby a Bill of Sale identifying the 24 OTR Tires by make, model and specific serial number and executed a Seller's Warehouse Release Letter directed to XPO.  XPO, through Baltagi, sent a signed Non-Negotiable Warehouse Receipt to Kirby certifying that XPO had the 26 OTR Tires at the XPO Facility.  True and correct copies of Work Order 1-69067 and the related Bill of Sale, Seller's Warehouse Release Letter, and Non-Negotiable Warehouse Receipt are attached hereto as **Exhibit "W."**

56.     During each of the OTR Tire purchase transactions, after receiving the executed Warehouse Release Letters from Mid America and executed Non-Negotiable Warehouse Receipts from XPO, Kirby authorized LAD to send the funds to Mid America for each corresponding purchase.  Kirby authorized LAD to release the funds in reliance on Mid-America's, Wilkin's, Midwest's, Adkins', Baltagi's and XPO's representations and certifications that Kirby owned the OTR Tires and that XPO had the OTR Tires at its XPO Facility.

57.     In all, Kirby wired $6,691,000.00 to LAD for the purchase of 146 OTR Tires from Mid America.  Kirby also held title to the initial 54 OTR Tires purchased by Midwest and transferred to Kirby.  XPO, through the signed Non-Negotiable Warehouse Receipts and oral representations, certified that it was in possession of all 200 of Kirby's OTR Tires in storage at the XPO Facility.

***Midwest Allegedly Fails to Find a Buyer for Kirby's OTR Tires***

58.     By April 2016, Kirby and O'Connor had made several inquiries to Adkins as to why a sale of the purchased OTR Tires to Giant Tyres had not been completed.  Adkins responded that the market had slowed down.

59.     Due to the delay in the sale of the 200 OTR Tires owned by Kirby, on April 11, 2016, O'Connor, on behalf of Kirby, sent an email to Baltagi requesting that XPO conduct an inventory of the OTR Tires in relation to Kirby's annual audit.  Baltagi responded to that email on April 12, 2016, enclosing a completed inventory sheet, identifying by make, model and specific serial number the 200 OTR Tires held by XPO for the benefit and account of Kirby at the XPO Facility.  True and correct copies of the O'Connor and Baltagi Emails, dated April 11-12, 2016, and the audit report, are attached hereto as **Exhibit "X."**

60.     The representations from XPO, through Baltagi, eased Kirby's concerns regarding the delay in the sales of the 200 OTR Tires as Kirby had confirmation its OTR Tires were still in the possession of XPO.

61.     In the summer of 2016, Midwest, through Adkins, represented to Kirby and O'Connor that the sale to Giant Tyres could not be completed but that Midwest had other potential buyers for the OTR Tires.

62.     In or around November 2016, Midwest, through Adkins, represented to Kirby and O'Connor that a group in Turkey was interested in buying Kirby's OTR Tires.  Midwest, through Adkins, further represented to Kirby and O'Connor that LAD, through Neidik, represented the Turkish buyer.

63.     In order to induce Kirby's reliance on Midwest's and LAD's alleged ability to find a buyer for Kirby's OTR Tires, Neidik and Adkins arranged to wire a document to Kirby

from the alleged Turkish buyer.  In December of 2016, LAD, through Neidik, wired $280,000.00 to Kirby as the alleged Turkish buyer's deposit.  Despite assurances from Adkins and Neidik that the Turkish buyer would complete the purchase, no purchase ever occurred.

64.    By the middle of 2017, Kirby and O'Connor began to question Adkins as to the legitimacy of the purported buyers of the OTR Tires owned by Kirby.

65.    Kirby's concern about the inability of Midwest and LAD to sell the OTR Tires, however, was mitigated by the continuing assurances from XPO, through Baltagi, and Midwest, through Adkins, that the 200 Tires owned by Kirby were safely stored at the XPO Facility.

66.    In late 2017, Midwest, through Adkins, represented to Kirby that it had found a new buyer for Kirby's Tires from Singapore.  In furtherance of this representation, Adkins and Neidik arranged to have an Escrow Agreement signed by Kirby, the alleged buyer from Singapore, and LAD stating that the buyer from Singapore would wire $8,000,000.00 to LAD, Kirby would ship the OTR Tires to Singapore, and LAD would then wire the $8,000,000.00 to Kirby.

67.    Kirby, through O'Connor, however, determined in late 2017 that the purported buyer was fictional and that the email address supposedly belonging to the buyer was fake.

### *Kirby was the Victim of an Organized Fraudulent Scheme Perpetrated by Defendants*

68.    Late in 2017, Kirby, through investigation by O'Connor, learned of potentially fraudulent schemes by Adkins and Midwest, to convey, collateralize, and/or otherwise dispose of the OTR Tires in violation of the rights of Kirby established by the OTR Agreement, the Client Shipping Agreement, the Non-Negotiable Warehouse Receipts, and applicable law.  Specifically, Kirby learned that Adkins had approached XPO claiming authorization and authority to sell at least 24 of the OTR Tires owned by Kirby and held at the XPO Facility.

69.     In December of 2017, shortly after becoming aware of the actions of Adkins in relation to the OTR Tires, Kirby's agents John Smyth and Kiger attempted to reclaim Kirby's OTR Tires from the XPO Facility.  XPO's employees at the facility refused to allow Kirby to remove the OTR Tires but did allow Kirby personnel to enter the XPO Facility to inspect and inventory the OTR Tires.  Kirby's personnel completed a rough inventory of the OTR Tires at the XPO Facility, which revealed, based on visible serial numbers, that only approximately 105 of the 200 OTR Tires that XPO had represented to hold at its Houston facility for the account of Kirby remained at the XPO Facility.  See Plaintiff On-Site Inventory compiled by Scott Kiger and John Smyth, dated December 29, 2017, a true and copy of which is attached hereto as **Exhibit "Y"** and Memorandum re: Plaintiff's On-Site Inventory, dated January 1, 2018, a true and correct copy of which is attached hereto as **Exhibit "Z."**

70.     Notably, in addition to missing tires, Kirby's Memorandum references suspicious activity by multiple third-party personnel at the XPO Facility. See Ex. Z.

71.     Based on information developed to date, Kirby discovered that Defendants were involved in numerous fraudulent schemes using a similar OTR Tire investment opportunity, and that Kirby's alleged OTR Tire purchase from, through, and with the assistance of Defendants, was fabricated by the Defendants in order to obtain possession and convert Kirby's $6,691,000.00 payment.

72.     Adkins, Midwest, XPO, Mid America, LAD, Baltagi, Wilkins, Neidik, and Eckerd collectively conspired to make false representations, fabricate documents and intentionally mislead Kirby and its members, agents and representatives so as to induce Kirby to invest $6,691,000.00 in fraudulent OTR Tire transactions.

16

73.     In addition to fabricating documents, Defendants also fabricated alleged foreign buyers for the OTR Tires so as to induce Kirby to authorize LAD to release the $6,691,000.00 that Kirby wired to LAD.

74.     Giant Tyres, the initial alleged foreign buyer of Kirby's OTR Tires, as represented by Defendants, is a legitimate company but it was never contacted by Midwest, LAD, Adkins or Neidik regarding the purchase of any OTR Tires from Kirby.

75.     Upon information and belief, the initial 54 OTR Tires that Midwest purportedly bought from Mid America and contributed to Kirby include at least 24 tires that are subject to liens from a prior fraudulent transaction involving Abington Emerson Capital, LLC and are subject to the pending action in this Court at 2:17-cv-00143.

76.     Upon information and belief, LAD and Neidik wired the $6,691,000.00 of funds received from Kirby to Adkins, Midwest and/or other Adkins' controlled entities.  Alternatively, if LAD wired any of the $6,691,000.00 to Mid America, upon information and belief, Mid America and Wilkin wired the bulk of that money to Midwest, Adkins and/or other Adkins' controlled entities.

77.     Upon information and belief, Mid America (through Wilkin), XPO (through Baltagi), LAD (through Neidik) and Eckerd all received some of the money fraudulently obtained from Kirby for their participation in the conspiracy.

78.     Recent information shows that Adkins has directly wired thousands of dollars to Baltagi, some of which likely came from the money obtained from Kirby.  See $18,500.00 wire from Adkins to Baltagi, dated January 5, 2017, a true and correct copy of which is attached hereto as **Exhibit "AA."**

79.     As a direct and proximate result of Defendants' conduct, Kirby had lost at least $6,411,00.00.

## COUNT I
## Fraud – Midwest

80.     Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

81.     Midwest, through Adkins, made the following misrepresentations to Kirby, among others:

> a.   That Midwest had a buyer for OTR Tires in Australia, Giant Tyres;
>
> b.   That Midwest owned the initial 54 OTR Tires and would transfer the title of the 54 OTR Tires to Kirby as part of its contribution to the transaction between the parties;
>
> c.   That Midwest wired $600,000.00 to LAD for Kirby's purchase of OTR Tires;
>
> d.   That Midwest had $4,735,492.16 in assets (see Ex. E); and
>
> e.   That Mid America was the owner and seller of OTR Tires, including the OTR Tires to be purchased by Kirby.

82.     Midwest's misrepresentations were material to the transaction and Kirby would not have entered into the OTR Agreement or otherwise dealt with Midwest and the other Defendants without Midwest's misrepresentations.

83.     Midwest knew its misrepresentations were false, and had knowledge of their falsity.

84.     Midwest intended Kirby to rely on its false statements. Kirby would not have wired $6,691,000.00 to LAD but for Midwest's misrepresentations. Midwest, with the other

18

Defendants, created the fraudulent scheme to induce Kirby into wiring $6,691,000.00 to LAD for the purported purchase of OTR Tires.

85. Kirby was justified in relying on Midwest's misrepresentations as they were confirmed by the other Defendants. Kirby also conducted due diligence based on documents provided by Midwest and had no knowledge that the documents contained false information.

86. Kirby suffered harm as a result of Midwest's fraud: it wired $6,691,000.00 to LAD for the fraudulent purchase of OTR Tires and Kirby has not received its money back nor has it obtained possession of any of the OTR Tires it purportedly purchased.

## COUNT II
### Fraud – Mid America and Wilkin

87. Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

88. Mid America and Wilkin made the following misrepresentations to Kirby, among others:

> a. That Mid America held an ownership interest in all the OTR Tires that Kirby purchased;
>
> b. That Mid America was selling its ownership interest in the OTR Tires to Kirby;
>
> c. That Mid America sold the initial 54 OTR Tires to Midwest;
>
> d. That Work Orders and Bills of Sale that Mid America and Wilkin signed and provided to Kirby were valid, legitimate and accurate; and
>
> e. That Mid America owned 200 OTR Tires stored at XPO and that it had the authority to sell and release these tires to Kirby.

19

89.     Mid America's and Wilkin's misrepresentations were material and Kirby would not have wired $6,691,000.00 to LAD but for Mid America's and Wilkin's misrepresentations.

90.     Mid America and Wilkin knew their misrepresentations were false, and had knowledge of their falsity.

91.     Mid America and Wilkin intended Kirby to rely on its false statements.  Mid America and Wilkin represented Mid America as the seller of the OTR Tires, inducing Kirby into wiring $6,691,000.00 to LAD for the purported purchase of the OTR Tires.

92.     Kirby was justified in relying on Mid America's and Wilkin's misrepresentations as they were confirmed by the other Defendants and Mid America and Wilkin executed Bills of Sale and Work Orders, and Kirby had no knowledge that the documents contained false information.  Mid America and Wilkin also executed Warehouse Release Letters directed to XPO purportedly to release ownership and control of the OTR Tires to Kirby.

93.     Kirby suffered harm as a result of Midwest's and Wilkin's fraud: it wired $6,691,000.00 to LAD for the fraudulent purchase of OTR Tires and Kirby has not received its money back nor has it obtained possession of any of the OTR Tires it purportedly purchased.

## COUNT III
### Fraud – XPO and Baltagi

94.     Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

95.     XPO, through its authorized employee, agent and/or representative, Baltagi, made the following misrepresentations to Kirby, among others:

     a.  Prior to Kirby wiring any money to LAD, XPO and Baltagi showed Kirby 300 to 400 OTR Tires with serial numbers and assured Kirby that it would own the OTR Tires after it transferred the money to LAD;

b.  That Adkins, Midwest, Neidik, and LAD were trustworthy and that XPO had previously conducted legitimate business with both individuals and their companies;

c.  That XPO held 54 OTR Tires owned by Midwest at its XPO Facility;

d.  That XPO held 146 OTR Tires owned by Mid America at its XPO Facility;

e.  After each transaction, XPO and Baltagi confirmed that XPO had Kirby's OTR Tires in storage at its XPO Facility and confirmed its obligations to Kirby via the Non-Negotiable Warehouse Receipts (see Exs. T, U, V, and W); and

f.  On April 11, 2016, XPO and Baltagi provided a completed inventory sheet, identifying 200 OTR Tires held by XPO for the benefit and account of Kirby at the XPO Facility (see Ex. X).

96.     XPO and Baltagi's misrepresentations were material and Kirby would not have wired $6,691,000.00 to LAD but for XPO and Baltagi's misrepresentations.  Kirby also would not have authorized LAD to release Kirby's funds without XPO's and Baltagi's confirmation that XPO held the OTR Tires at its XPO Facility and only Kirby was authorized to sell or move the OTR Tires

97.     XPO and Baltagi knew their misrepresentations were false, and had knowledge of their falsity.  Despite their representations, they were aware that not all 200 of Kirby's OTR Tires were at the XPO Facility and of those that were, some were identified in transactions between other Adkins' controlled entities and other third parties.

98.     XPO and Baltagi intended Kirby to rely on its false statements.  XPO and Baltagi represented themselves as legitimate warehouse intermediaries that had conducted business with

the other Defendants in the past thereby inducing Kirby into wiring $6,691,000.00 to LAD for the purported purchase of the OTR Tires.

99.     Kirby was justified in relying on XPO's and Baltagi's misrepresentations as they were confirmed by the other Defendants and XPO and Baltagi provided Non-Negotiable Warehouse Receipts and an inventory sheet and Kirby had no knowledge that the documents contained false information.

100.     Kirby suffered harm as a result of XPO's and Baltagi's fraud: it wired $6,691,000.00 to LAD for the purchase of OTR Tires and authorized LAD to release that money. Kirby has not received its money back nor has it obtained possession of any of the OTR Tires it purportedly purchased.

## COUNT IV
## Fraud – LAD and Neidik

101.     Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

102.     LAD, through Neidik, made the following misrepresentations to Kirby, among others:

    a.   That the funds LAD received from Kirby would be used for the purchase of OTR Tires;

    b.   That LAD would hold Kirby's money in escrow until it received authorization from Kirby to release the funds;

    c.   That LAD would send Kirby's money to the purported seller of the OTR Tires, Mid America;

    d.   That Adkins did not control and/or own LAD;

      e.   That LAD received two wire transfers from Midwest for the purchase of the initial 54 OTR Tires; and

      f.   That legitimate foreign buyers for the OTR Tires existed.

103.    LAD's and Neidik's misrepresentations were material and Kirby would not have wired $6,691,000.00 to LAD without LAD's and Neidik's misrepresentations.

104.    LAD and Neidik knew their misrepresentations were false, and had knowledge of their falsity.

105.    LAD and Neidik intended Kirby to rely on their false statements. LAD and Neidik represented LAD as a legitimate freight forwarder necessary to complete the sale of the OTR Tires to foreign buyers that would hold Kirby's funds in escrow until it received authorization from Kirby to wire the funds to the seller, Mid America, inducing Kirby into wiring $6,691,000.00 to LAD for the purported purchase of the OTR Tires.

106.    Kirby was justified in relying on LAD's and Neidik's misrepresentations as they were confirmed by the other Defendants and Kirby had no knowledge that LAD and Neidik intended to wire Kirby's money directly or indirectly to the other Defendants.

107.    Kirby suffered harm as a result of LAD's and Neidik's fraud: it wired $6,691,000.00 to LAD for the purchase of OTR Tires and Kirby has not received its money back nor has it obtained possession of any of the OTR Tires it purportedly purchased.

## COUNT V
### Fraud – Eckerd

108.    Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

109.    Eckerd made the following misrepresentations to Kirby, among others:

a.  That there was a good investment opportunity with Eckerd's acquaintances buying and selling OTR Tires;

b.  That there were several buyers lined up to buy OTR Tires;

c.  That the OTR Tires would be purchased from Mid America;

d.  That Midwest had $4,735,492.16 in assets and a net income of $4,934,121.00 in 2014 (see Ex. A);

e.  That Adkins was trustworthy and a legitimate businessman; and

f.  That Eckerd would not personally participate or receive any money as a result of Kirby's OTR Tire purchases and sales.

110.   Eckerd knew his misrepresentations were false, and had knowledge of their falsity.

111.   Eckerd intended Kirby to rely on his false statements.  Eckerd represented the OTR Tire investment opportunity and Adkins as legitimate inducing Kirby into entering into the OTR Agreement and wiring $6,691,000.00 to LAD for the purported purchase of the OTR Tires.

112.   Kirby was justified in relying on Eckerd's misrepresentations as they were confirmed by the other Defendants and Kirby had no knowledge that Eckerd, a childhood acquaintance of Kirby's Kiger, was setting Kirby up to be defrauded by the other Defendants.

113.   Kirby suffered harm as a result of Eckerd's fraud: it wired $6,691,000.00 to LAD for the fraudulent purchase of OTR Tires and Kirby has not received its money back nor has it obtained possession of any of the OTR Tires it purportedly purchased.

## COUNT VI
### Breach of Contract – Midwest

114.   Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

24

115.    Kirby fully performed its obligations under the OTR Agreement including contributing and wiring $6,691,000.00 for the purchase of OTR Tires.

116.    Pursuant to the terms of the OTR Agreement, Midwest agreed to: (i) coordinate transportation and delivery of the OTR Tires to the designated port; (ii) inspect the OTR Tires at the XPO warehouse to confirm they conformed with specifications; (iii) protect the OTR Tires from risk of loss, damage, or theft; (iv) insure the OTR Tires; (v) ensure that the OTR Tires, including the already purchased initial 54 OTR Tires, vested in Kirby free and clear of all liens and encumbrances from the time of purchase to the resale; (vi) solicit non-affiliated third party buyers for the OTR Tires and resell them to such buyers; (vii) deliver the OTR Tires to the buyers after Kirby received the entire sales price and notified Midwest in writing that Midwest may release the OTR Tires to the buyer; and (viii) any other necessary actions requested by Kirby or O'Connor in connection with OTR Tire transactions.  Ex. I, p.2, ¶ 3.

117.    In breach of the OTR Agreement, Midwest failed to ensure that the OTR Tires, including the initial 54 OTR Tires, were vested in Kirby free and clear of all liens and encumbrances.

118.    Midwest also failed to solicit legitimate buyers for the OTR Tires.  All buyers Midwest allegedly found were either fictitious or unaware that Midwest identified them as a buyer.

119.    Moreover, Midwest failed to contribute $3,384,000.00 to Kirby, as required by the OTR Agreement, to the extent it did not own free and clear title in the initial 54 OTR Tires used as part of its contribution.

120.    As a direct and proximate result of Midwest's breaches, Kirby has suffered damages in excess of $6,691,000.00.

## COUNT VII
### Breach of Contract – Mid America

121.    Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

122.    Mid America executed and agreed to seven Bills of Sale purporting to sell and transfer title in 200 OTR Tires to Kirby.  See Exs. K, L, P, U, V, W.

123.    Kirby fully performed its obligations under the Bills of Sale by wiring the full purchase price of $6,691,000.00 for the purchase of the OTR Tires.

124.    To the extent the Bills of Sale from Mid America did not transfer free and clear title of some or all of the 200 OTR Tires to Kirby, Mid America is in breach of the Bills of Sale.

125.    As a direct and proximate result of Midwest's breaches, Kirby has suffered damages in excess of $6,691,000.00.

## COUNT VIII
### Breach of Contract - XPO

126.    Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

127.    Pursuant to the Client Shipping Agreement, XPO agreed to store any purchased OTR Tires at the XPO Facility and to subsequently ship the OTR Tires to buyers designated by Kirby.  See Ex. J.

128.    XPO also executed five Non-Negotiable Warehouse Receipts certifying that 200 OTR Tires owned by Kirby were received in storage for Kirby's account.  See Exs. T, U, V, and W.

129.    The Non-Negotiable Warehouse Receipts also expressly confirmed XPO's obligations to Kirby as follows:

> Delivery will be made to the person designated upon order of Kirby Development LLC. The terms of this Receipt governs the relationship between the parties to the sale of the above listed items and XPO Global Logistics and supersede any terms on any other bill of lading, delivery order, or warehouse receipt.

See Exs. T, U, V, and W.

130.　To the extent XPO failed to receive and/or store Kirby's 200 OTR Tires, it is in breach of the Client Shipping Agreement and the Non-Negotiable Warehouse Receipts.

131.　Upon information and belief, in breach of the Client Shipping Agreement and the Non-Negotiable Warehouse Receipts, XPO authorized or allowed third parties to wrongfully remove some of Kirby's OTR Tires from the XPO Facility.

132.　In breach of the parties' agreement, XPO has refused to deliver any of the OTR Tires in its possession to Kirby.

133.　As a direct and proximate result of Midwest's breaches, Kirby has suffered damages in excess of $6,691,000.00.

## COUNT IX
### Negligent Bailment – XPO

134.　Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

135.　Kirby requested services from XPO in relation to storage of Kirby's OTR Tires. XPO thereafter stored the OTR Tires and has since had possession of the OTR Tires pursuant to the Non-Negotiable Warehouse Receipts described above.  See Exs. T, U, V, and W.

136.　XPO was therefore a bailee of the OTR Tires and Kirby was the bailor.

137.　This bailment was for the mutual benefit of the bailor and the bailee and was based on a valid contract and consideration.

138.     XPO was under the duty to discharge in a reasonable manner all of the duties and obligations imposed on a bailee who is in possession of property, and that duty was breached by the manner and method in which XPO held, possessed, and disposed of the OTR Tires belonging to Kirby as described above.

139.     XPO was guilty of the following acts of negligence which, separately and concurrently, proximately caused injuries and damages to Kirby:

a.   Failing to take any of the necessary and reasonable measures to preserve the OTR Tires and to prevent fraudulent conveyance and/or disposal of the OTR Tires;

b.   Failing to notify and advise Kirby that the OTR Tires were being removed from XPO's possession in an unauthorized manner;

c.   Failing to stay adequately apprised of the condition, whereabouts, and authorizations relating to the OTR Tires while XPO had possession of the OTR Tires; and

d.   Disposing of the OTR Tires without Kirby's authorization, approval, permission, or consent.

## COUNT X
## Conversion – XPO

140.     Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

141.     Kirby requested services from XPO in relation to storage of Kirby's OTR Tires. XPO thereafter stored the OTR Tires but has now, after Kirby's multiple demands, failed to return the OTR Tires to Kirby's possession.

142.     Kirby is entitled to possession of the OTR Tires.

28

143.     XPO has assumed and exercised dominion and control over the OTR Tires in an unlawful and unauthorized manner, to the exclusion of and inconsistent with Kirby's rights.

144.     Kirby has since made a demand for the OTR Tires and XPO has refused and continues to refuse to turn over the OTR Tires as requested by Kirby.

## COUNT XI
## Civil Conspiracy – All Defendants

145.     Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

146.     Defendants, by common understanding and design, came to a mutual understanding to create false documents and communications purportedly evidencing an OTR Tire transaction to induce Kirby to enter into the OTR Agreement and wire $6,691,000.00 to LAD.

147.     Two or more persons were involved as all of Defendants participated in the conspiracy.

148.     Defendants acted with malice as they intentionally created fraudulent documents and communications for the express purpose of defrauding Kirby of more than $6 million.

149.     As part of and in furtherance of the conspiracy, Defendants created fraudulent documents and communications that were transmitted to Kirby for the express purpose of defrauding Kirby of more than $6 million.

150.     As a direct and proximate result of Defendants' conspiracy, Kirby has suffered damages in excess of $6,691,000.00.

<u>**COUNT XII**</u>

<u>**Violations of 18 U.S.C. § 1962(c) – All Defendants**</u>

151.    Kirby hereby incorporates by reference each preceding paragraph set forth in this Complaint as if fully rewritten herein.

152.    The Defendants formed a non-legal, "association-in-fact" enterprise with a distinct organizational structure that divided responsibilities between them:

a. Midwest, through Adkins, and Eckerd were responsible for soliciting Kirby, other purchasers, and lenders to buy tires or provide financing in fraudulent tire transactions.  Midwest and Eckerd also maintained an inventory of OTR Tires at the XPO Facility that could be repeatedly used as bait to entice buyers or lenders in fabricated sales to third party buyers.

b. Mid America, through Wilkin, acted as the "supplier" of the OTR Tires by producing and distributing fabricated work orders, invoices, and bills of sale.

c. XPO, through Baltagi, acted as the storage facility.  XPO would confirm that OTR Tires were on site at XPO's Houston facility causing purchasers to release funds or lenders to disburse financing.  XPO, through Baltagi, acted like an escrow agent for the tires: it "received" tires from Mid America and acted as an independent third party so that the purchaser or lender would feel comfortable disbursing funds or loan proceeds.

d. LAD, through Neidik, acted as the freight forwarder and escrow agent.  LAD was responsible for "shipping" the OTR Tires to buyers. LAD was also responsible for receiving funds from purchasers or lenders to hold in escrow until the purchaser or lender authorized LAD to release the funds.    In

furtherance of the fraud, LAD wired money to Adkins' entities such as Midwest instead of the actual seller of the OTR Tires.

153.    The Defendants' association-in-fact enterprise has been operating as a continuing enterprise as Midwest, through Adkins, and Eckerd have kept inventory at the XPO Facility continually since at least 2013 and Midwest and other Adkins entities have continued to create false purchases from Mid America since at least 2013.

154.    All the Defendants participated in the operation or management of the association-in-fact enterprise by assisting in the fraudulent scheme:

   a.  As stated in detail above, Eckerd and Midwest, through Adkins, participated and assisted in the fraud by soliciting Kirby as an unknowing victim in the Defendants' fraudulent scheme.

   b.  As stated in detail above, Eckerd also participated and assisted in the fraud by representing that there was a good investment opportunity with Eckerd's acquaintances buying and selling OTR Tires and providing Kirby with a step-by-step guide demonstrating how the fraudulent OTR Tire transactions worked.  Eckerd then introduced Kirby to Midwest and Adkins so Midwest and Adkins could perpetuate the fraud on Kirby.

   c.  As stated in detail above, Midwest, through Adkins, also participated and assisted in the fraud by representing that it had experience buying and selling OTR Tires and had a buyer in Australia to purchase the OTR Tires, and convincing Kirby to purchase over $6 million dollars of OTR Tires as part of a collaborative purchase with Midwest.  In actuality, Midwest, through Adkins, had already entered into transactions involving certain of the OTR

Tires that Kirby purchased and supplied false documents, including false works orders, statements of net worth, and bills of sale that induced Kirby into wiring over $6 million dollars to LAD for the purported purchase of OTR Tires.

d.   As stated in detail above, Mid America and Wilkin participated and assisted in the fraud by acting as the "supplier" of OTR Tires and executing false documents including bills of sale and work orders.

e.   As stated in detail above, XPO and Baltagi participated and assisted in the fraud by providing false warehouse receipts and confirmations that it held Kirby's OTR Tires at its XPO Facility.

f.   As stated in detail above, LAD, through Neidik and Adkins, participated and assisted in the fraud by receiving over $6 million dollars from Kirby for the purchase of OTR Tires from Mid America with no intention on wiring the money to Mid America or waiting for authorization from Kirby to wire any of Kirby's funds.  Instead, LAD, through Neidik and Adkins, wired Kirby's money to Midwest and other Adkins entities.  Neidik further participated in the fraud by presenting a false Turkish buyer for Kirby's OTR Tires.

155.   The Defendants' actions constitute numerous violations of the RICO predicate offenses listed in 18 U.S.C. § 1961(1).  As fully described above, Eckerd, Midwest, Mid America, XPO, LAD, Baltagi, Wilkin, and Neidik engaged in numerous counts of wire fraud in violation of 18 U.S.C. § 1343, numerous counts of money laundering in violation of 18 U.S.C. § 1956, and numerous counts of engaging in monetary transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957.

156. The Defendants' actions also sufficiently meet the open-ended continuity requirement as there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed. Midwest, through Adkins, and Eckerd continue to maintain inventory at the XPO Facility. Midwest, through Adkins, and Mid America, through Wilkin, continue to communicate and maintain a consistent business relationship. The association-in-fact enterprise does not have an ending point. Additionally, there is no perceivable limit to the number of companies or individuals that Defendants could seek to defraud as evidenced by the numerous lawsuits alleging Defendants participated in similar fraudulent transactions.

157. Kirby's injuries and losses were caused by Defendants' racketeering activities. The Defendants acts of wire fraud in violation of 18 U.S.C. § 1343 caused the transmission of falsified records via email to Kirby that were specifically designed to induce Kirby to distribute over $6 million dollars for the fraudulent purchase of OTR Tires. Because Defendants provided these false records via electronic transmission in violation of 18 U.S.C. § 1343, Kirby was fraudulently induced to wire transfer over $6 million dollars to LAD, thereby suffering injury. Kirby also suffered harm as a result of Defendants' money laundering, engaging in monetary transactions in property derived from specified unlawful activity, transportation of stolen money, and receipt of stolen money in violation of 18 U.S.C. §§ 1956, 1957, 2314, and 2315.

158. Kirby has suffered harm to its business and property. Because of Defendants' racketeering activities, Kirby was fraudulently induced to disburse more than $6 million dollars, which is lost as a result of Defendants' conduct, and, to date, has been deprived of the 200 OTR Tires it purportedly purchased.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Kirby Developments LLC, demands judgment against Defendants, XPO Global Forwarding, Inc. d/b/a XPO Global Logistics, Inc. and XPO Logistics, Midwest Coal, LLC, Mid America Tire of Hillsboro, Inc. d/b/a Best-One Tire & Service of Hillsboro, Afif Baltagi, John Eckerd, Todd Wilkin, L.A.D. Impex Corporation, and Ahmet Neidik, as follows:

a. Compensatory damages in excess of $75,000.00;

b. Incidental damages;

c. Attorneys' fees pursuant to 18 U.S.C. § 1964(c);

d. Pre-judgment and post-judgment interest at the statutory rate;

e. Punitive damages;

f. Treble damages pursuant to 18 U.S.C. § 1964(c);

g. Costs; and

h. Any further relief that this Court deems just and equitable.


Respectfully submitted,


*/s/ Matthew S. Casto*
Matthew S. Casto, Esq. (Ohio No. 0071427)
Mark D. Shepard, Esq. (Pro Hac Vice Forthcoming)
Sean R. Keegan, Esq. (Pro Hac Vice Forthcoming)
BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.
BB&T Square
300 Summers Street Suite 1000
Charleston WV 25301
681-265-1364 (telephone)
681-205-8814 (fax)
mcasto@babstcalland.com
*Counsel for Kirby Developments, LLC*