# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

KIRBY DEVELOPMENTS LLC,    :
    :
       Plaintiff,    :    Case No. 2:18-CV-500
    :
    v.    :
    :    JUDGE SARAH D. MORRISON
XPO GLOBAL FORWARDING, INC., :    MAGISTRATE JUDGE KIMBERLY
    :    JOLSON
*et al.*,    :
    :
       Defendants.    :

## OPINION & ORDER

Plaintiff Kirby Developments, LLC, alleges it was a victim of a massive Ponzi scheme involving the sale of Off the Road ("OTR") mining tires orchestrated by Defendants Jason Adkins, XPO Logistics, Inc. and XPO Global Forwarding, Inc. (collectively "XPO"), Midwest Coal, LLC, Mid America Tire of Hillsboro, Inc. d/b/a Best-One Tire & Service of Hillsboro, Jason Adkins, Afif Baltagi, John Eckerd, Todd Wilkin, L.A.D. Impex Corporation, and Ahmet Neidik.[1] XPO moves for summary judgment (ECF No. 177) and to strike certain testimony of Richard Armstrong, Kirby's expert. (ECF No. 178). In turn, Kirby seeks an Order that Pennsylvania law applies to some, but not all, of its claims. (ECF No. 176.) Briefing on the three motions being complete, the Court **GRANTS** in part and **DENIES** in part the Motions for Summary Judgment (ECF No. 177) and to Partially Exclude (ECF No. 178), and **DENIES** the Motion to Apply Pennsylvania Law (ECF No. 176).

---

[1] Defendant Fox, Byrd & Company was previously dismissed from the case. (ECF No. 155.)

## I. BACKGROUND

### A. Parties and Participants

Given the multitude of players involved in this matter, the Court begins by summarizing the role of each.

| Name | Status | Role | Residency |
|------|--------|------|-----------|
| Kirby | Plaintiff | Real estate holding company. OTR tire buyer. | West Virginia LLC. Principal place of business in Pennsylvania. |
| Scott Kiger | Non-party | 50% owner of Kirby. (ECF No. 190-1, PageID 6757.) | Pennsylvania resident. |
| Charlie Riggs | Non-party | 50% owner of Kirby. (ECF No. 190-1, PageID 6757.) | Unclear |
| Jim Cunningham | Non-party | In-house counsel for Kirby. | N/A |
| John O'Connor | Non-party | Business consultant for, and advisor to, Kirby. (ECF No. 194-1, PageID 9138.) Co-owner with Adkins of OTR Tires Direct, Inc. (ECF No. 195-1, PageID 9537.) | N/A |
| OTR Tires Direct, Inc. | Non-party | Pennsylvania corporation involved in OTR tire sales. (ECF No. 195-57, PageID 9921.) Co-owned by O'Connor and Adkins. | N/A |
| Jason Adkins | Defendant | Principal of Defendant Midwest Coal, LLC. (ECF No. 91, PageID 1115.) | Ohio |
| Midwest Coal, LLC | Defendant | Buyer and reseller of OTR tires. (ECF No. 82-9, PageID 978.) | Ohio corporation. Principal Place of Business in Ohio. |

| John Eckerd | Defendant. Bankruptcy stay in effect.[2] | Friend of Adkins. | Texas |
| --- | --- | --- | --- |
| Todd Wilkin | Defendant. Bankruptcy stay in effect. | Principal of Mid America Tire of Hillsboro, Inc. d/b/a Best-One Tire & Service of Hillsboro. | Ohio |
| Mid America Tire of Hillsboro, Inc. d/b/a Best-One Tire & Service of Hillsboro | Defendant. Bankruptcy stay in effect. | Tire seller and distributor. | Ohio corporation. Principal place of business in Ohio. |
| XPO Logistics, Inc. | Defendant | Holding company. Parent of Defendant XPO Global Forwarding, Inc. | Delaware corporation. Principal place of business in Connecticut. |
| XPO Global Forwarding, Inc.[3] | Defendant | Wholly owned subsidiary of XPO Logistics, Inc. Storage facility for tires. | Delaware corporation. Principal place of business in Illinois. |
| Afif Baltagi | Defendant | XPO employee. Branch manager at XPO's Houston, Texas location. | Texas |
| L.A.D. Impex Corporation | Defendant. Bankruptcy stay in effect. | Escrow agent and freight forwarder for deal. (ECF 91, ¶ 41.) | New Jersey corporation. Principal place of business in New Jersey. |
| Ahmet Neidik | Defendant. Bankruptcy stay in effect. | Principal and owner of L.A.D. | New Jersey |

---

[2] XPO indicates Eckerd's bankruptcy was terminated via discharge in December 2019. (ECF No. 177, PageID 2571.) No stay lift motion has been filed with the Court so his bankruptcy stay remains in place.

[3] XPO Logistics argues it is not a proper party because it is merely the parent and holding company of XPO Global Forwarding. (ECF No. 177, PageID 2555.) XPO Logistics has not moved to be dismissed and therefore remains a party.

### B.    Deal Formation

Eckerd went to grade school with Kiger's wife. (ECF No. 190-1, PageID 6744.)
Many years later, Eckerd and Kiger connected to discuss a possible investment in
an OTR tire deal. (ECF No. 190-1, PageID 6744-46.) Kiger asked O'Connor to
conduct financial due diligence about the proposal. (ECF No. 190-1, PageID 6746-
6747; ECF No. 175-1, PageID 1814.) Neither Kirby nor O'Connor had any prior
experience with OTR tires and the corresponding market.

O'Connor spoke with Eckerd via telephone at the end of September 2015.
(ECF No. 195-2, PageID 9576.) Eckerd followed-up on that conversation by e-
mailing O'Connor several documents on October 26, 2015 ("October Documents").
(ECF No. 195-3.) The October documents included: (1) Midwest Coal's balance sheet
as of September 1, 2015 (ECF No. 195-3, PageID 9578); (2) an accountant's report
for Midwest Coal showing a nearly $5 million profit for 2014 but stating "the owner
has elected to omit substantially all of the disclosures ordinarily included in
financial statements . . . ." (ECF No. 195-3, PageID 9581); (3) articles about the OTR
industry (ECF No. 195-3, PageID 9584, 9617); (4) a description of typical OTR
transactions (ECF No. 195-3, PageID 9618-9620); (5) a sample OTR procurement
agreement (ECF No. 195-3, PageID 9621); and (6) a sample warehouse receipt, bill
of sale, and warehouse release letter (ECF No. 195-3, PageID 9634-40). O'Connor
reviewed the documents but did nothing to verify the information contained within
them, other than to Google prices for OTR tires. (ECF No. 195-1, PageID 9497-99.)

4

Kiger alerted Riggs to the opportunity. Although Riggs did not review the October Documents, he was interested. (ECF No. 196-1, PageID 10511; ECF No. 196-1, PageID 10512.) Kiger also asked Cunningham to learn more about the deal. So O'Connor, Cunningham, Riggs, Adkins, and Eckerd met at a Cracker Barrel restaurant ("first meeting") in Pennsylvania on October 29, 2015 to discuss the potential deal. (ECF No. 194-1, PageID 9140, 9143; ECF No. 195-4, PageID 9641; ECF No. 175-1, PageID 1816.) This meeting enabled Eckerd to introduce Adkins to the Kirby representatives and allowed Adkins to explain the opportunity. (ECF No. 175-1, PageID 1817; ECF No. 194-1, PageID 9149.) Adkins described the OTR industry and how Kirby could make money buying and re-selling OTR tires. (ECF No. 175-1, PageID 1817-1818.) Adkins pitched the deal as Kirby loaning Midwest Coal money so that Midwest Coal could buy OTR tires and quickly resell them to an Australian buyer within three to six months at a forty percent profit. (ECF No. 175-1, PageID 1818; ECF No. 196-1, PageID 10518.) Eckerd and Adkins mentioned that XPO's Houston location was where they preferred to store the tires. (ECF No. 195-1, PageID 9504; ECF No. 175-1, PageID 1820.)

The Kirby team left the meeting interested in the opportunity and determined to do more research about the offer. (ECF No. 175-1, PageID 1818; ECF No. 196-1, PageID 10514.) Kiger was "not in the business of loaning money," so he and Riggs decided that if the deal was to proceed, Kirby would buy and own the tires. (ECF No. 175-1, PageID 1819; ECF No. 195-1, PageID 9504.) Additionally, the team was comfortable with using XPO as storage facility because it was a large

5

public company that Kiger had done business with in the past. (ECF No. 175-1, PageID 1820; ECF No. 190-1, PageID 6756.)

All of the original Kirby representatives but Riggs met with Adkins and Eckerd again on November 11, 2015 (the "second meeting") at a Cracker Barrel.[4] (ECF No. 175-6, PageID 1987.) The Kirby contingent proposed Kiger's alternative structure for the deal. Eckerd and Adkins agreed to the change. The Kirby representatives left this meeting "more comfortable with the deal and how it was going to be structured." (ECF No. 175-1, PageID 1820.)

Later that evening, O'Connor informed Adkins via e-mail that "everyone is on board" and that O'Connor would have Cunningham get started on a draft agreement. (ECF No. 195-1, PageID 9643.) O'Connor further asked Adkins to provide him with copies of: (1) Midwest Coal's 2014 tax return; (2) a list of all tires, with serial numbers, that were to be involved in the transaction; (3) proof of purchase for the tires; (4) documents from L.A.D. (the freight forwarder); and (5) XPO's contact information. (ECF No. 195-1, PageID 9643.)

On November 12, 2015, Adkins provided his personal 2014 tax returns and Midwest Coal's financials to O'Connor. (ECF No. 195-5, PageID 9643.) The unsigned tax return showed that Adkins owed $2 million to the IRS. (ECF No. 195-5, PageID 9647-9648.) The financials indicated that Midwest Coal had $2 million as of September 1, 2015. (ECF No. 195-5, PageID 9647-9648.) Adkins also sent O'Connor a list ("List") of tire sizes, brands, models, and costs for the fifty-four OTR tires

---

[4] It is unclear whether this was the same Cracker Barrel where the first meeting took place or if it was a different location of the restaurant.

("Initial Tires") Midwest Coal would contribute to the deal and the 146 OTR tires Midwest Coal and Kirby would buy for the deal.[5] (ECF No. 195-1, PageID 9508; ECF No. 195-10, PageID 9672; ECF No. 195-11, PageID 9675.) Serial numbers for the tires were not included.

That same day, O'Connor e-mailed Cunningham and Riggs detailing the source of funds for the proposed deal. (ECF No. 195-13, PageID 9678.) Specifically, Midwest Coal would contribute $600,000 cash plus the Initial Tires (valued at $2,784,000); O'Connor would contribute $1 million; Kiger, on behalf of Kirby, would contribute $2,845,500; and Riggs, on behalf of Kirby, would contribute $2,845,500. (ECF No. 196-1, PageID 10516; ECF No. 194-1, PageID 9165; ECF No. 196-12, PageID 10646-10657.) O'Connor included the List from Adkins in the e-mail. *Id*. No one from Kirby saw pictures of the Initial Tires or attempted to inspect them. (ECF No. 195-1, PageID 9509.)

O'Connor and Cunningham spoke with Baltagi on November 13, 2015. (ECF No. 195-1, PageID 9510-11; ECF No. 175-1, PageID 1832.) Baltagi identified himself as XPO Houston's branch manager. (ECF No. 195-1, PageID 9510-11; ECF No. 175-1, PageID 1832.) He gave an overview of the documents XPO would complete for the transaction. (ECF No. 195-1, PageID 9510-11; ECF No. 175-1, PageID 1832.) He said XPO would check the tires upon arrival. (ECF No. 195-1, PageID 9510-11; ECF No. 175-1, PageID 1832.) After that, XPO would provide Kirby with a completed warehouse receipt.  (ECF No. 195-1, PageID 9510-11.) He told O'Connor and

---

[5] The tax returns, financials, and List from November 2015 will be referred to as the "November Documents."

Cunningham that he had done a lot of tire business with Adkins over the years. (ECF No. 195-1, PageID 9510-11.) He said XPO would not do anything with the tires absent direction from Kirby. (ECF No. 175-1, PageID 1832.) He said Kirby must complete a Client Shipping Agreement to enable XPO to store the tires. (ECF No. 175-1, PageID 1833.) The Client Shipping Agreement was "designed to document the inception of a business relationship and d[id] not obligate [Kirby] to transact business with XPO Global Logistics." (ECF No. 175-22, PageID 2210.) He subsequently sent Kirby the Client Services Agreement, which named "**XPO**GlobalLogistics" at the top of each page. (ECF No. 175-22, PageID 2209-2215; bold in original.) However, the form provided an incorrect e-mail address for XPO. (ECF No. 175-22, PageID 2212.) Kirby completed and returned the form to XPO. (ECF No. 175-1, PageID 1833.)

O'Connor reviewed Baltagi's LinkedIn profile that showed Baltagi's employment at XPO Houston. (ECF No. 195-1, PageID 9513.) O'Connor also called XPO Houston and confirmed that Baltagi was the branch manager. (ECF No. 195-1, PageID 9513.)

Based upon the parties' communications, Cunningham drafted the OTR Tire Purchase and Resale Agreement ("Agreement"). (ECF No. 175-1, PageID 1834.) Adkins made no changes to the Agreement before signing. (ECF No. 195-1, PageID 9515.) Kiger, but not Riggs, signed the Agreement on November 17, 2015. (ECF No. 194-6, PageID 9321-9330.) Riggs was "silent partner" for the deal. (ECF No. 196-1, PageID 10519.) Key terms included:

8

- Kirby contributed $5.6 million, O'Connor contributed $1 million, Adkins contributed $600,000, and Midwest Coal contributed the Initial Tires. (ECF No. 194-6, PageID 9329; ECF No. 194-1, PageID 9164.) The Initial Tires would be titled in Kirby's name. *Id*.

- Midwest Coal and Kirby would use the cash to purchase an additional 146 OTR tires from Mid America Tire. (ECF No. 194-1, PageID 9164.) All tires would be shipped to XPO Houston and would be owned by Kirby. (ECF No. 194-6.)

- When the tires arrived in Houston, XPO would send Kirby confirmation of receipt. Mid America Tire would then give Kirby a Bill of Sale and a Warehouse Release Letter. Next, XPO would provide Kirby with a Warehouse Receipt stating that XPO possessed the tires and recognizing Kirby as the tires' owner. (ECF No. 175-1, PageID 1838; ECF No. 194, PageID 9169.)

- Upon receipt of those documents, Kirby would wire funds to L.A.D. and authorize L.A.D. to distribute the sales price to Mid America Tire.

- Midwest Coal would re-sell the tires, hopefully quickly and at a profit. (ECF No. 194-6.)

- Sale proceeds would be distributed on an agreed-upon pro-rata basis. (ECF No. 194-6.)

## C. Tire Transactions/Post-Agreement Activities

The parties wasted no time getting business done under the Agreement. One day after the Agreement was signed, Mid America Tire, via Wilkin, provided Kirby with two Bills of Sale establishing Kirby as the owner of the Initial Tires. (ECF Nos. 82-12, 82-13.) Each bill of sale included serial numbers for the tires. *Id*. Mid America Tire also gave Kirby two Warehouse Release Letters instructing XPO that Kirby owned the Initial Tires and directing XPO to take further orders with respect to those tires only from Kirby. (ECF No. 82-13.)

9

Kirby then purchased forty-eight more tires from Mid-America. On November 19, 2015, Mid America Tire provided Bills of Sale and Warehouse Release Letters to Kirby regarding those tires. (ECF Nos. 82-16, 82-17.) Again, the tires' serial numbers were included in the paperwork. (ECF No. 82-16.) At this point, Kirby "owned" 102 tires.

Central to the instant motions are Baltagi's communications with Kirby's representatives. His November 19, 2015 e-mail to O'Connor confirmed XPO's receipt of the 102 tires. (ECF No. 175-34.) His November 20, 2015 e-mail to O'Connor included pictures of the Initial Tires stacked on top of each other in an outdoor lot as well as two Warehouse Receipts. (ECF No. 175-1, PageID 1847; ECF No. 175-39.) The Receipts appeared as follows:

### WAREHOUSE RECEIPT (NON-NEGOTIABLE)

Receipt No. 219126

XPO Logistics, Inc.
4513 Oates Road
Houston, TX 77013
(832) 239-5807
www.xpogloballogistics.com

This Non-Negotiable Warehouse Receipt is to certify that XPO Global Logistics, Inc, referred to as Warehouseman, has received in storage for the account of Kirby Development LLC of Mt. Morris, PA the following items:

| GOODS | TYPE | SIZE | WEIGHT | STORAGE RATE | HANDLING RATE |
|---|---|---|---|---|---|
| 48-TIRES | MICHELIN | 4000R57 | | | |
| 06-TIRES | BRIDGESTONE | 4000R57 | | | |
| | | | | | |
| | | | | | |

Delivery will be made to the person designated upon order of Kirby Development LLC. The terms of this Receipt governs the relationship between the parties to the sale of the above listed items and XPO Global Logistics and supersede any terms on any other bill of lading, delivery order, or warehouse receipt.

By: _____, XPO Global Logistics, Inc.

Date: _____, 2015

11

WAREHOUSE RECEIPT (NON-NEGOTIABLE)

Receipt No. 219129

XPO Logistics, Inc.
4513 Oates Road
Houston, TX 77013
(832) 239-5807
www.xpogloballogistics.com

This Non-Negotiable Warehouse Receipt is to certify that XPO Global Logistics, Inc, referred to
as Warehouseman, has received in storage for the account of Kirby Development LLC of Mt.
Morris, PA the following items:

| GOODS | TYPE | SIZE | WEIGHT | STORAGE RATE | HANDLING RATE |
|-------|------|------|--------|--------------|---------------|
| 24-TIRES | GOODYEAR | 4690R57 | | | |
| 24-TIRES | GOODYEAR | 53/80R63 | | | |
| | | | | | |
| | | | | | |

Delivery will be made to the person designated upon order of Kirby Development LLC. The terms
of this Receipt governs the relationship between the parties to the sale of the above listed items and
XPO Global Logistics and supersede any terms on any other bill of lading, delivery order, or
warehouse receipt.

By: _____, XPO Global Logistics, Inc.

Date: _____11/20_____, 2015

(ECF No. 175-39.)

After Kirby received the Warehouse Receipts from Baltagi, Kirby wired $2.1

million to L.A.D. on November 20, 2015, to buy forty-eight tires from Mid America

Tire. (ECF No. 82-14.)

*O'Connor's inventory.* Three days later, O'Connor visited XPO Houston to

inventory Kirby's tires. (ECF No. 195-1, PageID 9525.) He testified:

BY MS. MOTLEY:

Q. Handing you what we're marking as Exhibit 44. Exhibit 44, the bottom email is from you to Mr. Riggs dated November 24th. You say, Charlie, I saw the tires in Houston yesterday and matched about 20 percent of the serial numbers. The tires are stacked and you cannot get to most of the serial numbers. Do you see that?

A. Yeah.

Q. What was the purpose of you going to Houston if you couldn't see the serial numbers?

A. To -- I believe it might have been Charlie and/or Scott wanted at least a site visit to make sure that, you know, we could -- the tires were there and we could meet Afif, and it was just a prudent thing to do.

Q. But you wouldn't have had any expertise to know whether the tires were used or in good condition, right?

A. Anybody could tell if they were in good condition just looking at them.

Q. What did you do to determine that?

A. Checked all the -- went through and checked all the serial numbers we could see --

Q. Which --

A. -- that weren't stacked.

Q. Which was 20 percent of t hem?

A. Yeah, because they're stacked very high and they weigh about 8,000 pounds each.

Q. Okay. And you did not retain a fork lift to do a full inspection, right? You didn't move the tires?

A. They were concerned about damage. But there was 20 percent of the ones that I could physically see, and the numbers were written on the outside of the other ones, and I checked the size and added up and talked with Afif, and I was comfortable.

Q. When you say the numbers were written on the outside, do you mean –

A. Serial numbers.

Q. In paint or something?

A. It was some type of paint or chalk that rain would ruin.

Q. Do you know who put those numbers on the side of the tires?

A. No.

Q. And you didn't confirm that the numbers painted on the side were the same as the serial numbers of those tires, right?

A. I couldn't.

Q. And you don't know when those serial numbers were painted on the side of the tires, right?

A. No.

Q. And you don't know what type of tires those were because you couldn't see the sidewalls when they were stacked, right?

A. But they were the same width, so they couldn't have been much different at all.

Q. But you didn't know that? You didn't know what manufacturer those tires were?

A. Right. You couldn't check each single one.

(ECF No. 195-1, PageID 9529-30.)

O'Connor met with Baltagi during this visit to Houston. They discussed the necessity of XPO checking Kirby's tires upon arrival and the importance of Warehouse Receipts. (ECF No. 195-1, PageID 9526.) O'Connor told Baltagi that XPO could not release Kirby's tires without Cunningham, Riggs, or Kiger signing a warehouse release form.  (ECF No. 195-1, PageID 9525.)

14

*Subsequent transactions.* Kirby bought more OTR tires under the Agreement between November 30, 2015 and January 12, 2016. For each transaction, Baltagi provided Kirby with confirmation that XPO Houston received the tires and with additional Warehouse Receipts. Only after receiving Baltagi's confirmations did Kirby authorize L.A.D. to wire money to Mid America Tire. (ECF No. 175, PageID 1848.) In total, Kirby purchased 200 OTR tires for $6.7 million. (ECF Nos. 82-14, 82-15, 82-21, 82-22, 82-23.)

**D.  Claims**

The tires were never re-sold. By mid-December 2017, Kirby learned that its tires were no longer at XPO Houston. (ECF No. 194-1, PageID 9182.) Kiger, Riggs, and O'Connor lost all the money they invested in the Agreement.

Adkins is currently awaiting sentencing for wire fraud, money laundering, and tax evasion for his role in this and other similar deals gone bad. Midwest Coal is defunct. Eckerd is in federal prison for money laundering. *U.S.A. v. Eckerd*, No. 1:19-cr-332 (D. N.J. May 6, 2019). Neidik, L.A.D., and Mid America Tire are in bankruptcy. XPO and Baltagi are the only active defendants at this time.

Kirby's First Amended Complaint asserts six counts against XPO premised upon Baltagi's conduct. XPO denies all claims. (ECF No. 109.) Due to bankruptcy stays and pursuant to the Court's November 20, 2018 Opinion and Order (ECF No. 47), Kirby's only active claims against XPO are for fraud, breach of contract, negligence, civil conspiracy, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). (ECF No. 91.) XPO moves for

15

judgment on each. Kirby's claims against XPO for negligent bailment and conversion remain stayed as does the discrete allegation in Kirby's breach of contract claim about the ownership of the tires under the November 20, 2018 Opinion and Order (ECF No. 47) and are therefore not at issue.

The Court will first examine XPO's Motion to Partially Exclude Expert Testimony of Evan Armstrong (ECF No. 178) before addressing Kirby's Motion for Partial Summary Judgment (ECF No. 176) and then to XPO's Motion for Summary Judgment (ECF No. 177).

## II.   XPO'S MOTION TO PARTIALLY EXCLUDE

This motion relates to Kirby's fraud claim. (ECF No. 178.) Kirby argues that it reasonably relied upon the Warehouse Receipts Baltagi signed when authorizing wire transfers to Midwest Coal via L.A.D. Kirby's proposed expert on this topic, Evan Armstrong, opines that Baltagi had authority to sign the Warehouse Receipts. (ECF No. 178-1, PageID 3739.) Armstrong further posits that the documents comport with industry custom and that Kirby's reliance on them was reasonable. (ECF No. 178-1, PageID 3754.) He submits that XPO acted unreasonably when responding to a non-party's complaint about an incident that happened after the Midwest Coal deal. (ECF No. 178-1, PageID 3750-53.) Armstrong lastly concludes that Kirby's due diligence for the deal was reasonable. (ECF No. 178-1, PageID 3753-54.) XPO moves to exclude those opinions under Fed. R. Evid. 702 for lack of expertise. (ECF No. 178.) XPO's motion is partially **GRANTED** and partially **DENIED**.

16

### A. Rule 702

Federal R. Evid. 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The rule "imposes a special obligation upon a trial judge to ensure that scientific testimony is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 137 (1999) (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993)). This basic gatekeeping obligation applies to all expert testimony. *Kumho Tire Co.*, 526 U.S. at 147.

"[U]nder *Daubert* and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of relevant issues." *Decker v. GE Healthcare* Inc., 770 F.3d 378, 391 (6th Cir. 2014) (citations omitted). "[T]he issue with regard to expert testimony is not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question."

*Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Exclusion is proper when "the subject of the testimony lies outside the witness' area of expertise." 4 Weinstein's Fed. Evid. § 702.06[1], at 702-52 (2000). "In other words, a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue." *CDA of Am. Inc. v. Midland Life Ins. Co.*, No. 01-CV-837, 2006 U.S. Dist. LEXIS 97327, at *8 (S.D. Ohio Mar. 27, 2006) (Marbley, J.) (citation omitted).

### B. Armstrong's Qualifications

The basis for XPO's motion is Armstrong's alleged lack of knowledge about the OTR tire market and the freight forwarding industry. So, the Court begins by reviewing Armstrong's professional background.

Armstrong's knowledge about XPO predates the company's existence. Armstrong worked for Brad Jacobs before Jacobs purchased Express-1 Expedited Solutions, which became XPO Logistics. Armstrong assisted Jacobs with the Express-1 acquisition and initial strategy for the company. (*Abington Emerson Capital, LLC v. Jason Adkins, et. al.*, Case No. 17cv-143, ECF No. 349 at 18-20.) Armstrong reasons that role gave him insights into "what [XPO] was going to look like" and "what [XPO's] capabilities were going to be." *Id*. Armstrong characterizes himself as a "general industry analyst" who profiles XPO Logistics each year. *Id*.

Armstrong has more than twenty-five years of supply chain management experience. (ECF No. 178-1, PageID 3756.) As a customer satisfaction analyst at Roadway Package System, Inc., he analyzed pricing programs and oversaw thirty-

six drivers. *Id*.  When he worked for Carolina Freight Carriers Corporation as a special projects manager, he managed sales departments. *Id*. In 1995, he joined Innovative Logistics, Inc. as a customer service analyst. *Id*. at PageID 3756. Next, he spent five months as a logistics project manager at C.H. Robinson Company. *Id*. He then worked for Roadrunner Freight Systems, Inc. as a vice president of pricing and traffic services. *Id*. In that capacity, he was responsible for pricing, claims, billing, rating and the auditing departments. *Id*. He supervised thirty-two employees, none of whom were branch managers. (*Abington*, ECF No. 349, PageID 23076-77.)  He did not conduct due diligence in any of the above positions. (ECF No. 193-1, PageID 8983-86.)

He joined Armstrong & Associates, Inc., his father's company, in 2000 as vice president. (*Abington*, ECF No. 349, PageID 23269.) Since about 2006, he has served as President of Armstrong & Associates, Inc. *Id*. In that role, he provides consulting services to supply chain participants in the areas of "business planning, logistics outsourcing, mergers and acquisitions, operations benchmarking, market analysis and benchmarking, transportation management, and supply chain systems evaluation and selection." (ECF No. 178-1, PageID 3756.) Consulting accounts for 70% of the company's revenue; marketing, 30%. (*Abington*, ECF No. 349, PageID 23265, 23267.) His company concentrates on market research in, and consulting for, third-party logistics companies. (ECF No. 178-1, PageID 3733.) A "3PL" is a third-party logistics provider who manages the transportation of goods between the seller and buyer. Armstrong characterizes XPO as a 3PL.

Armstrong & Associates, Inc. has a "strong niche in providing research around the third-party logistics market and performing consulting work that's third-party logistics related." (*Abington*, ECF No. 349, PageID 23262.) The research includes surveys and reviewing annual reports and yields market estimates for logistics costs and revenues. *Id*. at PageID 23146. The company tracks more than 650 3PLs globally; many of those have freight forwarding services. *Id*. The company has been publishing reports on contract warehousing in North America since 2004. (*Abington*, ECF No. 349-4, PageID 23378.) Armstrong & Associates also reviews warehousing operations and helps its clients find 3PLs. *Id*. at PageID 23127, 23266. The company works with vendors for 3PLs. *Id*. at PageID 23266.

Armstrong's review of XPO's website helped form the basis of his opinion as to what business activities XPO engages in. *Id*. at PageID 23068-69. But his review took place in 2020, not 2015, the year the Midwest Coal deal occurred. *Id*. at PageID 23254-55. Armstrong reviewed Concert's operations manual from 2011 (the year XPO acquired Concert) to formulate his opinion as to XPO's Houston's operations in 2015. *Id*. at PageID 23073, 23152-54. He "do[esn']t think" that XPO modified Concert's manual because XPO provides services similar to those of Concert. *Id*. at 23153-54.

He has no experience in the OTR tire industry. (ECF No. 193-1, PageID 9009.) Thus, he has not previously: (1) consulted on deals involving OTR tire sales; (2) valued OTR tires; (3) seen a bill of sale: (4) seen tire work orders; or (5) seen a seller's warehouse release letter. (ECF No. 193-1, PageID 8997-98, 9008.)

He does not know what the standard process is for buying OTR tires. (ECF No. 193-1, PageID 9008.)

He has never been to XPO's Houston location but he has seen pictures of it, and he has been to "a lot" of 3PL warehouses. (*Abington*, ECF No. 349, PageID at 23320, 23074-76.) He has no experience managing a freight forwarder location. *Id.* at PageID 23075.

### C. Analysis

XPO moves to preclude Armstrong from testifying about whether: (1) Abington acted reasonably in relying on the Warehouse Receipts; (2) the Warehouse Receipts comport with industry custom and practice; (3) Baltagi violated XPO's signatory policy in executing the Warehouse Receipts; (4) XPO acted reasonably in responding to an unsatisfied customer in 2016; and (5) Kirby's due diligence was reasonable. (ECF No. 178, PageID 3713.) XPO argues that preclusion is necessary because Armstrong lacks the requisite expertise to make his opinions reliable. Kirby counters Armstrong has sufficient experience; that exclusion of his noted opinions would serve only to usurp the jury's function; and that Rule 702 permits the opinions to be admitted because they would assist the jury to understand the evidence or to determine a fact in issue.

*Warehouse Documents, Industry Custom and Practice and Baltagi's Signing the Warehouse Documents.* Kirby asserts that it relied upon the Warehouse Receipts, each of which Baltagi signed, when deciding to wire money to Midwest Coal via L.A.D. after a tire purchase made pursuant to the Agreement. XPO

contends that reliance was unjustified because the Warehouse Receipts were "obvious fakes." (ECF No. 177, PageID 2587.) Specifically, XPO points out that they contained different iterations of XPO's name.  (ECF No. 177, PageID 2587-88.) The columns for weight, storage rate, and handling rate were left blank. (ECF No. 177, PageID 2587-88.) And the receipts lacked XPO's logo. (ECF No. 177, PageID 2587-88.) XPO also argues that Baltagi did not have authority to execute them. *(*ECF No. 177, PageID 2597.)

In his report, Armstrong opines that "it is standard industry practice for warehouse branch managers to have the authority to sign warehouse receipts, inspection reports, and other documents confirming the receipt, existence, and control of inventory in the management of warehouse operations." (ECF No. 178-1, PageID 3736.) This opinion requires familiarly with paperwork similar to the Warehouse Receipts. But Armstrong lacks that familiarity. To be clear, Armstrong testified that he has "probably been in 100 warehouses" and "sometimes they'll have standard documents on a blackboard, as well. I've looked at a lot of boards." (*Abington*, ECF No. 349, PageID at 23289.) He testified warehouse receipts are "usually scattered out on some desk in a receiving area." (*Abington*, ECF No. 349 at 23288.)  He "might have glanced at warehouse receipts as part [of] the receiving process." (*Abington*, ECF No. 349 at 23289.) He googled "warehouse receipts" in connection with this case. (*Abington*, ECF No. 349 at 23288.)

Seeing something and understanding what is seen are different things. To illustrate, Armstrong could not answer whether a warehousing company would

have a template for those documents or when they should or would be issued. (*Abington*, ECF No. 349 at 23284-87.) As such, he lacks sufficient knowledge as to the content and form of the Warehouse Receipts. Because Armstrong lacks adequate familiarity with the Warehouse Receipts, it follows that he also lacks sufficient understanding of whether said documents comport with industry custom and practice and whether Baltagi had authority to sign them. Kirby has thus failed to establish by a preponderance of the evidence that Armstrong has the requisite knowledge to render an opinion that Kirby's reliance on the Warehouse Receipts was reasonable, that those documents were in-line with industry custom and practice, and that Baltagi had the authority to execute the papers. XPO's Motion to Partially Exclude Armstrong's testimony as to those three topics is **GRANTED**. (ECF No. 178, PageID 3718.)

*2016 Customer Complaint.* Star Funding was a client of XPO. Star Funding engaged in a similar deal with Adkins a year after Kirby's deal failed. Adkins failed to repay Star Funding's loan. Star Funding's OTR tires were also stored at XPO's Houston location according to documents Baltagi executed, which documents were identical in all key respects to the Warehouse Receipts in this case. In May 2016, five months after the final purchase was made under the Agreement in this case, Star Funding complained to XPO that Baltagi had released its tires to Adkins without its consent. Upon receiving the complaint, XPO did not respond that Baltagi lacked authority to authorize the storage of the tires or to execute documents about the tires' location and condition. XPO did not audit Houston's tire

inventory. Rather, one month after receiving the complaint, Baltagi resigned as branch manager. (*Abington*, ECF Nos. 316-3, 316-12.) In July 2016, he became an independent contractor for XPO. (*Abington*, ECF Nos. 316-3, 316-12.)

Kirby argues that XPO should have audited the Houston location and fired Baltagi. (ECF No. 182, PageID 3915-17.) Its failure to do so, according to Kirby, equates to XPO's ratification of Baltagi's actions and subjects XPO to vicarious liability, especially because Baltagi continued to execute warehouse receipts for other OTR tires stored at the Houston location after the Star Funding complaint. (ECF No. 183, PageID 4120.) In support, Kirby offers Armstrong's opinion that XPO's "executive management team failed to adhere to standard industry practice by ignoring indicators of poor performance, collections issues, and other operational warnings at its Houston station and refraining from performing a full investigation or audit of the Houston station." (ECF No. 178-1, PageID 3736.) Armstrong testified that XPO should have fired Baltagi after Star Funding's complaint. That conclusion is ostensibly meant to imply that by not firing Baltagi and by not conducting an audit of the Houston location, XPO was admitting that Baltagi did have the authority to execute the Warehouse Receipts.

Addressing the audit component, Armstrong was not charged with determining whether a fraud audit should be instigated in response to a customer complaint. (*Abington*, ECF No. 349 at PageID 23126-23129.) Rather, he was asked to opine how an audit should be completed. But Armstrong's deposition reveals limited knowledge as to what should, and should not be, included in a fraud audit.

24

For example, while he attached a sample warehouse audit checklist to his report, he said the checklist was designed for an operations audit, not a fraud audit. (*Abington*, ECF No. 349 at PageID 23229-23232; ECF No. 349-4.) The admittedly incomplete checklist, which does not pertain to freight forwarding operations like XPO Houston, matches that description. (*Abington*, ECF No. 349 at PageID 23299-23232.) While there are a few checkboxes for things like instructions for inbound goods, recording of items received, and product quantity, the majority of the list focuses on operational issues like eyewash stations, non-smoking signs, fire alarms, handicapped access, pest control, and safe forklift speeds. (ECF No. 178-1, PageID 3764-3777.) Armstrong testified that a more appropriate checklist would be found at one of the large 3PLs like XPO; this, of course, begs the question of why he, himself, did not procure one prior to his testimony. (*Abington*, ECF No. 349, PageID 23230-31.) His deposition transcript indicates no familiarity with what should be included on a checklist for a fraud audit at a freight forwarding operation, which is what is at issue here. (*Abington*, ECF No. 349, PageID 23226-23239.) He could not confirm that he had ever seen a such a checklist. *Id.*

Armstrong's experience with fraud audits is limited. He participated in a general, non-fraud transportation audit for a freight forwarding client more than five years ago. (*Abington*, ECF No. 349, PageID 23155-23161.) That audit involved reviewing freight bills to determine whether the client was being properly charged. (*Abington*, ECF No. 349, PageID 23155-23161.) He testified that he participated in an internal audit when working for Roadway Package System. (*Abington*, ECF No.

349, PageID 23126.) Yet, his participation was limited to telling auditors where
documents were. (*Abington*, ECF No. 349, PageID 23126.) Neither he nor
Armstrong & Associates have performed a fraud audit. (*Abington*, ECF No. 349,
PageID 23156.)

    Taking the totality of Armstrong's experience into consideration, the Court
holds that Kirby has failed to prove by a preponderance of the evidence that
Armstrong has the requisite knowledge of audits to satisfy the reliability
requirement. He shows limited to no familiarity with what a fraud audit should
entail. This lack of knowledge prevents him from determining when and how a
fraud audit should occur. Indeed, he instigated a fraud audit and he has not
participated in a fraud audit. For these reasons, XPO's Motion to Preclude
Armstrong's testimony as to whether XPO should have conducted a fraud audit at
the Houston location upon receipt of Star Funding's Complaint is **GRANTED**.

    A different result is reached with respect to Armstrong's opinion that XPO
should have fired Baltagi after the Star Funding complaint. Armstrong's opinion is
based on his thirty years' of experience in the industry. (*Abington*, ECF No. 349,
PageID 23201.)  He has managerial experience and he has terminated employees
for "performance issues." (*Abington*, ECF No. 349, PageID 23201-2.)  He has a
substantial work history for, and familiarity with, 3PLs. Kirby additionally points
to Armstrong's work for Roadway as a customer satisfaction analyst to show that he
has been involved in addressing customer complaints. (ECF No. 182, PageID 3920.)
In contrast, XPO highlights the fact that Armstrong has no experience in human

resources and no experience in overseeing branch managers. (*Abington*, ECF No. 349, PageID 23074-23077; 23199-23201.)

The Court holds that Kirby has satisfied its burden to show by a preponderance of the proof that Armstrong's extensive industry experience, coupled with his prior management positions, is sufficient to allow this testimony to be presented to the jury on this issue. The amount of his experience in human resources and with overseeing branch managers goes to credibility, which is an issue for the jury. XPO's Motion to Preclude Armstrong's testimony to the effect that XPO should have fired Baltagi upon the receipt of Star Funding's complaint is **DENIED**.

*Due Diligence*. As noted, O'Connor completed financial due diligence for the Agreement. Before the Agreement, O'Connor had no tire-related transaction experience or knowledge of OTR tires. (ECF No. 194-1, PageID 9137; ECF No. 195-1, PageID 9495.) So, he began by learning more about the people involved in the deal. O'Connor did not research Eckerd because Eckerd was not going to sign the Agreement. (ECF No. 194-1, PageID 9166.) O'Connor spoke with Neidik and Baltagi about Adkins, as Neidik and Baltagi both claimed to have done business with Adkins in the past. (ECF No. 194-1, PageID 9166; ECF No. 195-1, PageID 9510-11; ECF No. 175-1, PageID 1832.)

O'Connor also focused on materials Adkins provided. He reviewed the October Documents. (ECF No. 195-1, PageID 9496-9500.) Specifically, he googled the listed OTR tire cost information to see if the October Documents' cost figures

were reasonable. (ECF No. 195-1, PageID 9499.) He "did a lot of research" and read unnamed online articles about OTR tire market demand. (ECF No. 195-1, PageID 9501.) He could not confirm whether he spoke with any tire brokers to confirm reasonable prices and costs for tires. (ECF No. 195-1, PageID 9501.) He looked-up what "bonded freight forwarder" meant. (ECF No. 195-1, PageID 9502.) He did not compile a written report of his findings; rather, he orally informed Kirby's representatives of what he learned. (ECF No. 195-1, PageID 9501.) He also considered the November Documents. (ECF No. 195-1, PageID 9505.) O'Connor was not concerned with Adkins' $2 million tax liability evinced therein. (ECF No. 195-1, PageID 9506.)

As to entities involved in the deal, O'Connor "focused" his efforts on XPO because it was "going to be holding our tires and giving us title to them." (ECF No. 194-1, PageID 9162.) Those efforts included "a lot of internet research" about the company, like looking at XPO's website and reading XPO's financial statements. (ECF No. 195-1, PageID 9506.) He also reviewed XPO's profile on CNBC and MarketWatch. (ECF No. 195-1, PageID 9506.) He could not recall whether his research focused on XPO Global or XPO Logistics. (ECF No. 195-1, PageID 9507.)

Kiger assigned Cunningham legal due diligence for the deal. (ECF No. 190-1, PageID 6750-51.) This consisted of drafting the Agreement. (ECF No. 175-1, PageID 1823.)

Armstrong opines that the due diligence efforts of O'Connor and Cunningham were reasonable. XPO asserts that Armstrong lacks the requisite expertise to render an opinion on the topic.

XPO is correct. Armstrong's professional focus is on "operational due diligence" for "transportation logistics." (ECF No. 193-1, PageID 8983, 8994, 8998.) Hence, has no experience with OTR tires or deals involving same and does not know what typical documents would be relative to those deals. (ECF No. 193-1, PageID 8996-98, 9008.) He does not know whether an independent valuation of the OTR tires is typically performed before OTR tire deals are inked. (ECF No. 193-1, PageID 8998.)  He does not know how gray market tires would be valued. (ECF No. 193-1, PageID 9005.)

Additionally, Kirby relied on Warehouse Receipts when determining whether to wire money to Mid America Tire for the sales. (ECF No. 175-1, PageID 1848.) Yet, Armstrong had never seen a Warehouse Receipt prior to being shown one in this case. (ECF No. 193-1, PageID 8997.) Importantly, but unsurprisingly, he admits that he has no experience with OTR tire deal due diligence such that he lacks the expertise necessary to perform due diligence in OTR tire transactions. (ECF No. 193-1, PageID 8993, 9003.) He further concedes he has no general expertise in the OTR tire industry. (ECF No. 193-1, PageID 9009.) Under these circumstances, the Court concludes that Kirby has failed to prove by a preponderance of the evidence that Armstrong has the requisite knowledge to

29

satisfy the reliability requirement. XPO's Motion to Exclude Armstrong's Testimony as to due diligence is **GRANTED**. (ECF No. 178.)

*Management System*. Lastly, Armstrong's report states that "XPO Logistics/XPO Global failed to adhere to typical industry standards by refraining from fully implementing a warehouse management system in connection with the Houston station's operations." (ECF No. 178-1, PageID 3736.) XPO moves to preclude the admission of this opinion at trial but fails to articulate a basis for its exclusion. (ECF No. 178, PageID 3716, n.3.) The Court will not fill that void. Hence, XPO's Motion to Preclude Armstrong's testimony on this topic is **DENIED**.

In sum, XPO's Motion to Partially Exclude Expert Testimony of Evan Armstrong is **GRANTED** in part and **DENIED** in part. (ECF Nos. 178, 198.)

## III.    KIRBY'S MOTION TO APPLY PENNSYLVANIA LAW

Because the Agreement specifies that Pennsylvania law applies, Kirby seeks a ruling that Pennsylvania law governs its fraud claims against all defendants. (ECF No. 176.) Kirby also asks the Court to apply Pennsylvania law to any respondeat superior or vicarious liability analysis. (ECF No. 176; ECF No. 199, PageID 11267.) XPO argues that Kirby fails to identify its threshold burden to warrant a choice of law analysis. (ECF No. 361.) Alternatively, XPO asserts that Ohio law governs both issues. *Id*. Kirby replies a conflict discussion is necessary and that Pennsylvania law should apply. (ECF No. 199.)

Preliminarily, the Court notes that there is no motion pending against Midwest Coal, Mid America Tire, Adkins, Eckerd, Wilkin, L.A.D., and Neidik.

Because the Court does not issue advisory opinions, the Court's present determination on the choice of law question is limited in applicability to Kirby's fraud claims versus XPO and Baltagi. After due review, the Court decides that Ohio law is properly applied to the fraud count and respondeat superior analysis.

Ohio requires the presence of conflict before engaging in any choice of law discussion. *Akro-Plastics v. Drake Indus.*, 685 N.E.2d 246, 248 (11th Dist. 1996). "If the two states would use the same rule of law or would otherwise reach the same result, it is unnecessary to make a choice of law determination because there is no conflict of law." *Mecanique C.N.C., Inc. v. Durr Envtl., Inc.*, 304 F. Supp. 2d 971, 975 (S.D. Ohio 2004) (Marbley, J.). Here, Kirby, as the party seeking application of the law of a foreign jurisdiction, bears the burden of establishing conflict. *Id.* Should it fail to sustain its burden, Ohio law applies. *Gouge v. BAX Global, Inc.*, 252 F. Supp. 2d 509, 521 (N.D. Ohio 2003)(citation omitted).

### A. Respondeat Superior & Vicarious Liability

Kirby fails to delineate any differences between Ohio and Pennsylvania law for the respondeat superior and vicarious liability analyses. Accordingly, Kirby failed to satisfy its burden and the Court will apply Ohio law to those issues. *Mecanique C.N.C., Inc.*, 304 F. Supp. 2d at 975.

### B. Fraud

Kirby argues that material distinctions exist between the two states' fraud laws in the form of liability—Ohio requires a fraud plaintiff to investigate before reliance will be reasonable while Pennsylvania does not; and damages—Ohio has a

31

punitive damages cap, Pennsylvania does not. (ECF No. 176, PageID 2544-46.) XPO contends Ohio has no strict investigation requirement. (ECF No. 181, PageID 3880-82.)  In a footnote, XPO concedes the distinction in damages but argues any damage discussion is premature in the absence of a liability finding. (ECF No. 181, PageID 3883, n.5.)

Turning first to justifiable reliance, the "penultimate" element of fraud, Kirby selectively quotes from *Toy v. Metro. Life Ins. Co.*, 593 Pa. 20, 54, 928 A.2d 186, 207 (2007) to assert that  Pennsylvania law never requires an investigation for reliance to be reasonable. *Euclid Bus. Park, LLC v. Peters*, Cuyahoga Co. Ct. Cmn. Pleas No. CV 06 589304, 2013 Ohio Misc. LEXIS 71, at *26; ECF No. 199, PageID 11262. Specifically, Kirby quotes *Toy* that the "recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely[.]" (ECF No. 199, PageID 1262.) But the remainder of that quote qualifies the statement by clarifying that the recipient of an allegedly fraudulent misrepresentation is "not justified in relying upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious." *Toy*, 928 A.2d at 207. In Pennsylvania, "justifiable reliance is typically a question of fact for the fact-finder to decide, and requires a consideration of the parties, their relationship, and the circumstances surrounding their transaction." *Toy*, 928 A.2d at 208 (citing *Scaife Co. v. Rockwell-Standard Corp.*, 446 Pa. 280, 285 A.2d 451, 455 (Pa. 1971)).

Ohio law is no different. "Ohio law requires a person to exercise proper vigilance in dealing with others and, *at times*, to reasonably investigate before relying on statements or representations." *Harrel v. Solt*, 4th Dist. Pickaway No. 00CA27, 2000-Ohio-1964, *26 (emphasis added). A situation invoking the duty to investigate arises when there is a reason to doubt the veracity of the purported fraudulent misrepresentation. *Medpace, Inc. v. Biothera, Inc.*, No. 1:12-cv-179, 2015 U.S. Dist. LEXIS 41937, at *57-58 (S.D. Ohio Mar. 31, 2015) (Rice, J.). "Reliance is justifiable if the representation does not appear unreasonable on its face and if there is no apparent reason to doubt the veracity of the representation under the circumstances." *Mulch Mfg. Inc. v. Advanced Polymer Solutions, LLC*, 947 F. Supp. 2d 841, 862 (S.D. Ohio May 23, 2013). Like Pennsylvania law, "[t]he question of justifiable reliance is one of fact," *Mulch Mfg. Inc. v. Advanced Polymer Solutions, LLC*, 947 F. Supp. 2d 841, 862 (S.D. Ohio May 23, 2013), and requires an inquiry into "the nature of the transaction, the form and materiality of the representation, the relationship of the parties, the respective intelligence, experience, age, and mental and physical condition of the parties, and their respective knowledge and means of knowledge." *Andrew v. Power Mktg. Direct, Inc.*, 2012-Ohio-4371, 978 N.E.2d 974, 992 (10th Dist.).

In sum, both states impute a duty to investigate upon the recipient when there is reason to doubt the purportedly fraudulent statement's veracity. Both jurisdictions treat justifiable reliance as an issue of fact involving similar considerations. Kirby thus fails to establish an actual conflict between Pennsylvania

and Ohio law for its fraud claim. Kirby's Motion for Partial Summary Judgment to Apply Pennsylvania law to the fraud analysis is **DENIED** (ECF No. 181) and Ohio law will be applied.

### C. Punitive Damages

Kirby argues that the availability of unlimited punitive damages in Pennsylvania contrasted with Ohio's punitive damages cap for torts triggers a conflict analysis. (ECF Nos. 176, PageID 2525.) XPO concedes the difference but responds that any decision on punitive damages would be advisory until liability is established. (ECF No. 181, PageID 3883, n.5.) Neither side's argument proves dispositive of the issue.

Preliminarily, the Court determines that the choice of law question as to punitive damages is ripe. Several courts have engaged in such an inquiry prior to liability being established. *See In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.,* 517 F. Supp. 2d at 852 (applying Ohio law); *Salazar v. Ford Motor Company*, Case No. CIV 04-0477, 2004 WL 7337542 at *1 (D. N.M. Oct. 18, 2004); *Minebea Co. v. Papst*, 377 F. Supp. 2d 34, 40 (D.D.C. 2005); and *Talley v. Novartis Pharmaceuticals Corp.*, No. 3:08-cv-361, 2011 WL 2559974 at *1 (W.D. N.C. June 28, 2011)). This Court will follow their lead.

XPO does not argue that the noted monetary difference fails to necessitate a conflict analysis. Assuming, arguendo, that the conflict is enough to do so, this is a diversity case. Consequently, "the law of the forum state, including the forum state's choice-of-law rules, apply." *Burns v. Taurus Int'l Mfg.*, 826 F. App'x 496, 499

(6th Cir. 2020). Ohio adheres to the Restatement (Second) of Conflicts for choice of law questions. *Morgan v. Biro Mfg. Co.*, 15 Ohio St. 3d 339, 342 (1984). To that end, "the court must apply the Restatement analysis." *Charash v. Oberlin Coll.*, 14 F.3d 291, 296 (6th Cir. 1994).

Restatement (Second) of Conflict of Laws § 171 establishes "[t]he law selected by application of the rule of § 145 determines the measure of" punitive damages. Restatement (Second) of Conflict of Laws § 171 cmt. d (1971). Section 145(2) applies here and contains contacts to be considered in regard to "which state has the most significant relationship to the occurrence and the parties." *In re Nat'l Century Fin. Enters.*, 846 F. Supp. 2d 828, 851 (S.D. Ohio 2012) (Graham, J.).

"Punitive damages, as a general matter, are intended to fulfill different policy objectives than other tort rights and remedies. Punitive damages are typically permitted in order to punish and deter wrongful conduct, rather than to compensate victims for their losses." *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 517 F. Supp. 2d 832, 852 (E.D. La. 2007) (applying Ohio law) (citing *Digital & Analog Design Corp. v. N. Supply Co.*, 63 Ohio St.3d 657, 660, 590 N.E.2d 737 (1992), overruled on other grounds by *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 1994 Ohio 461, 644 N.E.2d 397 (1994)). Thus, "punitive damages claims *require* an independent analysis focused on the location of the defendants' conduct." *In re Commercial Money Ctr., Inc.*, 603 F. Supp. 2d 1095, 1127 (N.D. Ohio 2009) (emphasis added); *see also Minebea Co. v. Papst*, 377 F. Supp. 2d 34, 40 (D.D.C. 2005) (citation omitted) ("The issue of punitive damages is distinct

35

from that of liability for the underlying claims, however, and choice of law for that issue must be analyzed separately.")

But Kirby does not partake in any such analysis. (ECF Nos. 176, 199.)  Its failure to do so is fatal to its motion. Ohio, not Pennsylvania, law will apply to punitive damage issues if necessary.  Kirby's Motion for Partial Summary Judgment to apply Pennsylvania law to any punitive damage consideration is **DENIED** (ECF No. 181).

To conclude, Kirby's Motion for Partial Summary Judgment is **DENIED** in full. (ECF No. 178.)

## IV.  XPO'S MOTION FOR SUMMARY JUDGMENT

### A.  Standard Of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

36

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

### B. Analysis

#### 1. Fraud

In Count Three, Kirby alleges that XPO, via Baltagi, knowingly made materially fraudulent misrepresentations with the intent to have Kirby rely upon those false statements when authorizing the wires to L.A.D. and when authorizing L.A.D. to release those funds to Midwest Coal/Adkins. (ECF No. 91, ¶ ¶ 98-104.) Kirby seeks compensatory and punitive damages.

XPO argues judgment in its favor is proper on this Count because: (1) Kirby's reliance was unjustified; and (2) XPO cannot be vicariously liable for Baltagi's actions as a matter of law. (ECF No. 177, PageID 2599-2614.) XPO further contends punitive damages for the fraud count are improper.  (ECF No. 177, PageID 2613-14.) Kirby counters that its reliance was justified and that XPO can be found liable for Baltagi's actions under principles of respondeat superior, vicarious liability, apparent authority, and/or ratification. (ECF No. 183, PageID 4106-4124.) After due review, the Court finds XPO's arguments more persuasive.

#### a. General Overview

Under Ohio law, the elements for the tort of fraudulent inducement are: 1) a representation made, 2) material to the transaction, 3) which is false, with knowledge or with utter disregard and recklessness as its falsity, 4) with intent to

mislead, 5) justifiably relied upon, and 6) a resulting injury. *Countrymark Coop. v. Smith*, 124 Ohio App. 3d 159, 171-72 (3rd Dist. 1997) (citing *Burr v. Board of County Comm'rs.*, 23 Ohio St. 3d 69, 491 N.E.2d 1101 (1986)).

### b. Justifiable Reliance

XPO's first basis for judgment focuses on justifiable reliance, the "penultimate element" of Kirby's fraud claim. *Euclid Bus. Park, LLC v. Peters*, Cuyahoga Co. Ct. Cmn. Pleas No. CV 06 589304, 2013 Ohio Misc. LEXIS 71, *26 (Dec. 30, 2013). "Reliance is that degree of care which would be exercised in an average transaction between persons under similar circumstances. . . ." *Freedom Foods, Inc. v. Rose Valley Land Group, Ltd.*, No. 1:04cv-690, 2006 U.S. Dist. LEXIS 49591, *14-15 (S.D. Ohio July 20, 2006) (Weber, J.) (quotation and citation omitted). "Justifiable reliance is a standard that falls somewhere between actual reliance and reasonable reliance." *Peters*, 2013 Ohio Misc. LEXIS 71, at *26. "Reliance is justifiable if the representation does not appear unreasonable on its face and if, under the circumstances, there is no apparent reason to doubt the veracity of the representation." *Ownerland Realty, Inc. v. Zhang*, 12th Dist. Warren Nos. CA2013-09-77 and CA2013-10-97, 2014-Ohio-2585, ¶ 19 (citation omitted).

"Ohio law requires a person to exercise proper vigilance in dealing with others and, at times, to reasonably investigate before relying on statements or representations." *Harrel v. Solt*, 4th Dist. Pickaway No. 00CA27, 2000-Ohio-1964, *26. XPO asserts that Abington did not reasonably investigate Baltagi's representations such that its reliance on them was unjustified. (ECF No. 177,

PageID 2601.) In particular, XPO highlights Kirby's failure to: (1) obtain a valuation of the tires; (2) inspect the tires; (3) investigate Adkins' reputation; (4) consult industry experts; (5) address Adkins' misrepresentation regarding where the tires would be coming from; and (6) investigate the warehouse receipts. (ECF No. 177, PageID 2601-2606.) Jeffrey Cramer, XPO's due diligence expert, opined that Kirby's efforts in that regard were insufficient. (ECF No. 177-6, PageID 3402.) And Tom Stephenson, XPO's OTR mining tire industry expert, similarly opined. (ECF No. 177-7, PageID 3420, 3425-3424.)  In contrast, Armstrong, Kirby's expert, determined that Kirby's investigation was sufficient. (ECF No. 183-19.) But the Court excluded his opinion on this topic above.

The Court recognizes that whether reliance is justified is a question of fact. *Loan v. Fifth Third Bank*, No. 1:09-cv-930, 2011 U.S. Dist. LEXIS 170537, at *23 (S.D. Ohio Apr. 14, 2011) (Barrett, J.). Yet, that query requires expert input, as the OTR tire market is inherently specialized and complex. Both sides recognize this necessity, as each engaged experts on the topic. XPO has sustained its burden of demonstrating that Kirby lacks evidence to support an essential element of its case, justifiable reliance. In response, Kirby failed to present evidence that establishes a question of fact as to its justifiable reliance burden. For this reason, XPO's Motion for Summary Judgment on Count Three is **GRANTED**. (ECF No. 177.)

### c.  Respondeat Superior, Vicarious Liability, and Punitive Damages

Justifiable reliance is a *prima facie* element of fraud. *Kamnikar v. Fiorita*, 10th Dist. Franklin No. 16AP-736, 2017-Ohio-5605, ¶ 31. Kirby's failure to sustain

its summary judgment burden as to that element renders discussion of XPO's arguments regarding the respondeat superior, vicarious liability, and punitive damages aspects of the fraud count unnecessary.

## 2. RICO

Kirby's Fourteenth Count alleges that XPO, via Baltagi, violated 18 U.S.C. § 1962(c), the federal RICO statute, by acting as the storage facility and escrow agent for the tires. (ECF No. 91, PageID 1146, ¶ ¶ 175-192.) XPO argues it cannot be held vicariously liable for Baltagi's actions as a matter of law. (ECF No. 177, PageID 2593.) Kirby opposes, asserting that application of traditional respondeat superior principles renders XPO liable in this instance, or at least establishes genuine disputes of fact. (ECF No. 183, PageID 4094.) Kirby's arguments prevail.

Kirby describes the alleged RICO conspiracy as follows: Adkins, his business entities, and Eckerd solicited purchasers and lenders to provide financing for fraudulent tire transactions while maintaining and using their tire inventory as "bait" for the loans. (ECF No. 91, PageID 1146, ¶ 177.) Wilkin and Mid America Tire acted like the "supplier" of the tires. *Id.* ¶ 178. XPO and Baltagi acted as the storage facility. *Id.* at ¶ 179. Because purchasers or lenders would not disburse the loan until the tires were shipped to a warehouse facility, XPO, via Baltagi, "acted as an escrow agent for the tires . . . ." *Id.* Thus, XPO, through Baltagi, served as an association in fact enterprise with the other defendants to conduct the enterprise's affairs via "providing false warehouse receipts and confirmations that [XPO] held Kirby's OTR tires" at XPO's Houston location. (ECF No. 91, PageID 1148, ¶ 187.)

41

Kirby asserts Baltagi's actions amount to wire fraud and money laundering. (ECF No. 91, PageID 1148 ¶ 189.)

Section 1962(c) makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."[6] The elements of a RICO claim are not in play here. Rather, the issue as framed by the parties is whether XPO can be held vicariously liable for Baltagi's actions under RICO.

XPO makes four arguments: First, that liability under such a circumstance is not available as a matter of law. (ECF No. 177, PageID 2593.) Second, it did not receive a benefit from Baltagi's purported misconduct. (ECF No. 177, PageID 2594-96.) Third, it took no part in Baltagi's actions. (ECF No. 177, PageID 2596-97.) Fourth, Baltagi's alleged RICO violations were not within the course and scope of his employment. (ECF No. 177, PageID at 2597-2599.) The Court addresses each argument.

### a.    RICO Allows Liability Here

Relying on case law from New York, XPO argues that the idea of a corporation being vicariously liable for an employee's "'independent fraudulent acts'" is "'startling'" because the intent of RICO "'was to protect corporations from criminal infiltration,'" not to "'make them the responsible parties.'" (ECF No. 177,

---

[6] 18 U.S.C. § 1984 provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of" § 1962.

PageID 2593) (quoting *Banque Worms v. Luis A. Duque Pena E Hijos, Ltda.*, 652 F. Supp. 770, 772 (S.D.N.Y. 1986)).  Asserting that courts are therefore "hostile" to imposing vicarious liability under RICO, XPO states that "there is no question that a mere employment relationship alone falls well short of imposing vicarious RICO liability on a company." (ECF No. 177 PageID 2594.)

The Sixth Circuit does not share the New York's district courts' hesitancy in applying vicarious RICO liability under § 1962(c). The Sixth Circuit found that "[s]uch a prohibition, if it existed, would prevent corporate persons from ever being found liable under RICO, since corporate principals may act only through their agents. Such a rule would be manifestly contrary to the intent of Congress, and we decline to adopt it." *Davis v. Mut. Life Ins. Co.*, 6 F.3d 367, 379 (6th Cir. 1993). Accordingly, liability may be imposed upon "corporate 'persons' on account of the acts of their agents, particularly where the corporation benefitted by those acts" and the corporation is separate from the enterprise.[7] *Id*. at 379. Thus, vicarious liability is available here.

When does that liability attach? When the employees' criminal acts are done within the scope of their employment with the intent to benefit the corporation. *Trollinger v. Tyson Foods, Inc.*, No. 4:02-CV-23, 2007 WL 1091217, at *4 (E.D. Tenn. Apr. 10, 2007) (citing *Davis*, 6 F.3d at 379).

---

[7] XPO makes no argument regarding distinctness.

### b.    Vicarious Liability & Respondeat Superior

"It is a fundamental maxim of law that a person cannot be held liable, other than derivatively, for another's negligence. In an employment setting such as is before this court today, the most common form of derivative or vicarious liability is that imposed by the law of agency, through the doctrine of respondeat superior." *Albain v. Flower Hosp.*, 50 Ohio St. 3d 251, 254-55 (1990). Under this doctrine "[g]enerally, an employer or principal is vicariously liable for the torts of its employees or agents . . . ." *Nat'l Union Fire Ins. Co. v. Wuerth*, 122 Ohio St. 3d 594, 599 (2009). The application of respondeat superior "depends on the existence of control by a principal (or master) over an agent (or servant), terms that we have used interchangeably." *Id.* (citation omitted.)

XPO may be found vicariously liable for Baltagi's actions in three alternative situations. First, if he was acting within the course and scope of his employment when making the alleged misrepresentations. *Groob v. KeyBank*, 108 Ohio St. 3d 348, 355 (2005). Second, if XPO took some action indicating Baltagi had apparent authority for the misconduct. *Id.* at 358. Third, if XPO ratified his conduct. *Smith v. Bridal*, 11th Dist. Trumbull No. 2009-T-14, 2009-Ohio-6520, ¶ 20.

### i.    Scope of Employment and Benefit to XPO

"While an intentional tort is generally outside the scope of employment, an employer is held liable under respondeat superior if the conduct giving rise to the tort is calculated to facilitate or promote the business for which the servant is employed." *Callen v. Int'l Bhd. of Teamsters, Local 100*, 144 Ohio App. 3d 575, 580,

761 N.E.2d 51, 55 (2001) (quotation and citation omitted). But "an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Byrd v. Faber*, 57 Ohio St. 3d 56, 59 (1991). Typically, scope of employment is a question of fact. *Osborne v. Lyles*, 63 Ohio St.3d 326, 330 (1992). However, the "'scope of employment becomes a question of law'" when "'reasonable minds can come to but one conclusion . . . regarding scope of employment.'" *Carter v. Gerbec*, 9th Dist. Summit No. 27712, 2016-Ohio-4666, ¶ 25 (quoting *Osborne*, 63 Ohio St. 3d at 330).

The Court turns to the Restatement (Second) of Agency § 228 (1957) for the factors to determine whether Baltagi's actions were within the course and scope of his employment. *See Hale v. Spitzer Dodge, Inc.*, 10th Dist. Franklin No. 04AP-1379, 2006-Ohio-3309, ¶ 20. Pursuant to that section:

> (1)  Conduct of a servant is within the scope of employment if, but only if:
>> (a)  it is of the kind he is employed to perform;
>> (b)  it occurs substantially within the authorized time and space limits;
>> (c)  it is actuated, at least in part, by a purpose to serve the master, and
>> (d)  if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.
> (2)  Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

XPO only addresses Sections 228(1)(a), (1)(c), and (2). (ECF No. 177, PageID 2599 n. 43, 2608-2613.) The Court therefore does the same.

Section 228(1)(a) concentrates on whether the conduct is of a kind the employee is employed to perform. In this regard, Kirby alleges that Baltagi's tortious acts included fraudulently confirming inventory and executing and transmitting the

45

Warehouse Receipts. (ECF No. 183, PageID 4101-4103.) XPO argues that Baltagi took those alleged actions outside the course and scope of employment. In support, XPO asserts that its Houston location was not a warehouse, so it would never authorize Baltagi to confirm inventory or complete the Warehouse Receipts. (ECF No. 177, PageID 2609-2610.) In response, Kirby points to conflicting testimony indicating that Baltagi did have authority to do those things. (ECF No. 183, at 4102, 4105-4106.) Thus, genuine disputes of material fact exist as to whether Baltagi's conduct was of a kind he was authorized to perform.

As to § 228(1)(c), the Court asks whether Baltagi's conduct was "actuated, at least in part, by a purpose to serve" XPO because for vicarious RICO liability to attach, XPO must have benefitted from the alleged RICO violations. *Davis v. Mut. Life Ins. Co.*, 6 F.3d 367, 379 (6th Cir. 1993). XPO argues the answer to that query is negative because Baltagi's conduct in no way benefitted XPO. (ECF No. 177, PageID 2594.) But a jury could find differently, as XPO collected almost $170,000 in storage fees from Adkins. (ECF No. 183, PageID 4086-4087.)  XPO may not have had that business were it not for Baltagi's dealings with Adkins and Kirby. Moreover, intent is typically a jury question. *Brulport v. Coopervision, Inc.*, No. 92-3165, 1992 U.S. App. LEXIS 30496, at *9, 979 F.2d 850 (6th Cir. Nov. 10, 1992) (table). The Court concludes that genuine disputes of material fact exist as to whether Baltagi's actions benefitted XPO.

Despite that holding, XPO argues judgment in its favor remains proper because Baltagi violated several of XPO's policies when engaging in the acts at issue.

46

First, XPO's Signatory Policy prevented Baltagi from making the representations and completing and sending the Warehouse Receipts. (ECF No. 177, PageID 2598.) Second, XPO's Contracts Policy required him to obtain management approval before signing the Warehouse Receipts and sending the related e-mails to Kirby. (ECF No. 177, PageID 2598-2599.) XPO states that Baltagi did not secure the requisite approval before sending the e-mails and documents in violation of that policy. (ECF No. 177, PageID 2598.) Third, XPO had a policy prohibiting dishonesty ("Dishonesty Policy"). XPO argues that Baltagi acted in a dishonest manner in violation of that policy by not alerting XPO of his actions with respect to Kirby. Fourth, XPO had a policy prohibiting employees from engaging in fraudulent conduct ("Fraud Policy"). XPO asserts that Baltagi violated that policy through the Warehouse Receipts and his interactions with Kirby and the other individual defendants. Those polices and violations, XPO argues, insulate it from liability for Baltagi's actions.

The problem with those contentions is that XPO offers no proof that Baltagi received, or was actually aware of, the stated policies. XPO further fails to address the steps it took, if any, to enforce those policies. *United States v. Beusch*, 596 F.2d 871, 878 (9th Cir. 1979) ("Merely stating or publishing such instructions and policies without diligently enforcing them is not enough to place the acts of an employee who violates them outside the scope of his employment."). Thus, XPO's scope of employment argument as to XPO's policies fails to support summary judgment on the RICO count.

To summarize, genuine disputes of material fact are present, but not limited to, the scope of employment and benefit analyses. Judgment on these grounds is **DENIED**.

### ii. Apparent Authority

Next, XPO argues that Abington cannot establish liability on the basis of apparent authority. (ECF No. 177 PageID 2611.) "For the principal to be liable, the principal's acts must be found to have clothed the agent with apparent authority." *Groob*, 2006-Ohio-1189, ¶ 56 (citation omitted). An apparent-authority analysis focuses on the acts of the principal, not the agent. *Master Consol. Corp. v. BancOhio Natl. Bank*, 61 Ohio St. 3d 570, 576-577, 575 N.E.2d 817 (1991). For apparent authority liability to attach, the Supreme Court of Ohio directs that the evidence must affirmatively show that the: "(1) principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority, *and* (2) person dealing with the agent knew of those facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority." *Id.* at syllabus (emphasis added).

Beginning with the former, XPO argues that it did nothing to hold Baltagi out as a warehouse manager or to indicate that Baltagi had authority to sign the Warehouse Receipts. (ECF No. 177, PageID 2611-2612.) Kirby responds that XPO made Baltagi the branch manager at the Houston location. (ECF No. 183, PageID 4120.) "By giving an agent a title suggestive of certain authority, the principal holds

48

an agent out as having authority in the nature of the responsibilities commensurate with that title." *Delorean Cadillac v. Weaver*, No. 8th Dist. Cuyahoga No. 71827, 1997 Ohio App. LEXIS 4533, *10 (Oct. 2, 1997) (citation omitted). Kirby also asserts that XPO gave Baltagi authority to: (1) execute agreements "relative to the operations" of XPO's Houston location; (2) confirm receipt of goods; (3) accept clients' instructions for the handling of goods; (4) release goods; (5) negotiate customer contracts, and (6) manage all activities in Houston. (ECF No. 183, PageID 4056-4057, 4120) (citing supportive deposition testimony). Kirby thus argues that XPO, via the title and authority it gave to Baltagi, held Baltagi out to the public as possessing sufficient authority to confirm receipt of the tires and to execute the Warehouse Receipts. (ECF No. 183, PageID 4120.) Further, XPO received income from storage fees. Under these circumstances, the Court determines that summary judgment is inappropriate as to the first factor. This conclusion renders discussion of the second factor unnecessary.

XPO's Motion for Summary Judgment on Count Three based on apparent authority is **DENIED**. (ECF No. 177.)

### iii.    Ratification

XPO next argues that it did not ratify Baltagi's behavior because it did not know about his actions. (ECF No. 177, PageID 2599 n.43; ECF No. 177 PageID 26012-2613.) Kirby counters that XPO (1) should have known what Baltagi had been doing because of Star Funding, and (2) impliedly ratified Baltagi's actions by

49

retaining the storage fees such that XPO cannot escape liability by ratification. (ECF No. 183, PageID 4122.)

"A principal ratifies the unauthorized act of his agent if the 'principal, with full knowledge of the facts, conducts himself in a way which manifests his intention to approve an earlier act performed by his agent which did not bind him.'" *Bailey v. Midwestern Ent., Inc.*, 103 Ohio App.3d 181, 185 (10th Dist. 1995) (quoting *Karat Gold Imports, Inc. v. United Parcel Serv., Inc.*, 62 Ohio App.3d 604, 611 (8th Dist. 1989)). Knowledge need not be actual; rather, the knowledge component of ratification also includes what the principal should have known. *Clear Creek Pshp. v. LeBeau*, 10th Dist. Nos. 97APE04-568 and 97APE04-569, 1998 Ohio App. LEXIS 1890, *15-16 (Apr. 28, 1998). In addition, "[r]atification by the principal can be demonstrated by the retention of the benefits of the transaction." *Chevrolet v. Calhoun*, 10th Dist. No. 03AP-816, 2004-Ohio-1006, ¶ 19. With retention of the benefit comes retention of liability. *Rambacher v. Staton*, 4th Dist. Lawrence No. 1335, 1979 Ohio App. LEXIS 11157, at *5 (Oct. 12, 1979) (citation omitted).

Whether ratification occurred is usually a question of fact. *See Bailey*, 103 Ohio App. 3d at 185. The record here underscores the reason for that general rule. XPO argues Houston was not a warehouse facility. Yet, that location was openly storing tires. Furthermore, XPO retained nearly $170,000 in storage fees. And, Baltagi continued to perform work for XPO after Star Funding. These factors combine to create genuine disputes of material fact that are not limited to whether XPO should have known what Baltagi was doing and to whether XPO ratified

50

Baltagi's actions. Summary judgment on this portion of XPO's argument is **DENIED**.

### c. Lack of Involvement

XPO next argues that its lack of involvement in Baltagi's alleged fraud insulates it from RICO liability.  (ECF No. 177 PageID 2596-97.)  Put differently, XPO attempts to insert a third requirement for vicarious RICO liability to attach; that it must have been an *active* participant in the fraud. *Id*. In support, XPO references cases from foreign districts and circuits holding that a corporation must actively take part in a RICO violation for liability to attach for the unlawful acts of its employees. (ECF No. 177 Page ID 2596-97) (citing cases). Its citations are misplaced.

XPO first cites to *Holmes v. City of Racine*, No. 14-CV-208-JPS, 2014 U.S. Dist. LEXIS 154906 (E.D. Wis. October 31, 2014), wherein the court held "[t]o find a corporation liable [under RICO], the Court must find that the [corporation], *itself*, took some action." *Holmes*, 2014 U.S. Dist. LEXIS 154906 *44 (emphasis in original). But *Holmes* did not involve allegations of an employee acting as a corporation's agent like the case *sub judice* does.

XPO also relies on *O'Brien v. Dean Witter Reynolds, Inc.*, No. CIV 82-1605 PHX CLH, 1984 U.S. Dist. LEXIS 18239 (D. Ariz. Mar. 26, 1984) for its holding that "[c]ivil liability under RICO requires knowing or intentional participation and not mere negligence or recklessness." *O'Brien,* 1984 U.S. Dist. LEXIS 18239, at *11

(quotation and citation omitted). But *O'Brien* did not address the issue of vicarious liability. *Holmes* and *O'Brien* are therefore of no import.

In *Arvest Bank v. Rill*, No. CIV-07-417-FHS, 2008 U.S. Dist. LEXIS 30943, at *8 (E.D. Okla. Apr. 14, 2008), the district court declined to impose vicarious RICO liability on a corporate employer in part because that liability "is at odds with the intent and purpose of RICO." *Rill*, 2008 U.S. Dist. LEXIS 30943, at *9. Relying upon *D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 967 (7th Cir. 1988), *Rill* stated that "[a]n employer who is not an active participant in the scheme to defraud cannot be held accountable for its employees' racketeering activities because 'the statute [section 1962(c)] is designed to impose liability upon a corporation which is a perpetrator of illegal activity . . . not upon an unwitting conduit of its employees' RICO violations.'" *Rill*, 2008 U.S. Dist. LEXIS 30943, at *10 (quoting *Schwartz*, 838 F.2d at 967). But *Rill* "involved a corporation indistinguishable from the alleged RICO enterprise that neither benefited from nor participated in the criminal scheme." *Davis*, 6 F.3d at 379. Here, there is no distinctness issue and XPO may have benefitted from the scheme—at a minimum through the collection of storage fees. And, the Sixth Circuit held in *Davis* that the statute does allow for vicarious RICO liability. *Davis*, 6 F.3d at 379-80. Hence, *Rill* does not aid XPO's argument.

*Davis* discounts XPO's mention of *SK Hand Tool Corporation v. Dresser Industries, Inc.*, 852 F.2d 936, 941 (7th Cir. 1988), cert. denied, 492 U.S. 918, 106 L. Ed. 2d 589, 109 S. Ct. 3241 (1989). Relying upon *Schwartz*, *Dresser* held that a corporate defendant, as an "unwilling conduit," "cannot be held vicariously liable

52

under RICO for the independent acts of its employees." *Dresser*, 852 F.2d at 941 (citing *Schwartz*, 838 F.2d at 968). But the Sixth Circuit addressed and disposed of both *Dresser* and *Schwartz* in *Davis* while holding that vicarious RICO liability was available. *Dresser* thus fails to support XPO's argument. The noted cases are either distinguishable from or overlook controlling Sixth Circuit case law. XPO's Motion for Summary Judgment on the RICO claim based upon active involvement is **DENIED**. (ECF No. 177.)

In sum, XPO's Motion for Summary Judgment on Kirby's RICO claim is **DENIED** in full. (ECF No. 177.)

### 3. Breach of Contract

Count Eight alleges that the Client Shipping Agreement and the Warehouse Receipts equated to contracts between Kirby and XPO that XPO, via Baltagi, breached by failing to "receive and/or store Kirby's 200 OTR tires" and by allowing "third parties to wrongfully remove" some of those tires from XPO Houston. (ECF No. 91, PageID 1140-41, ¶ ¶ 130-37.)

XPO seeks judgment on the Client Shipping Agreement aspect of the count. (ECF No. 177, PageID 2614-15.) Kirby fails to address this portion of its breach claim in its Opposition. (ECF No. 183.) "'When a plaintiff asserts a claim in a complaint but then fails to delineate that claim in her brief in opposition to summary judgment, that claim is deemed abandoned.'" *Chic Promotions, Inc. v. Jewelers Mut. Ins. Co.*, No. 1:07cv417, 2009 U.S. Dist. LEXIS 87930, at *5 (S.D. Ohio Sep. 24, 2009) (Barrett, J.) (quoting *E.E.O.C. v. Home Depot U.S.A., Inc.*, No.

4:07CV0143, 2009 WL 395835, *17 (N.D. Ohio Feb. 17, 2009) (slip op.)). Summary

judgment is therefore **GRANTED** to XPO on Kirby's Client Shipping Agreement

breach of contract claim. (ECF No. 177.)

Regarding the Warehouse Receipts, XPO asserts two grounds for judgment.

First, XPO states that Baltagi lacked actual or apparent authority to execute them

such that XPO is not bound by them. (ECF No. 177, PageID 2615.) But the Court

finds genuine disputes of material fact present on that topic above, so this basis for

judgment fails. Second, XPO maintains that it could not breach the Warehouse

Receipts because Kirby cannot establish that the tires were ever at Houston,

therefore making it impossible for Baltagi to release them in violation of the

Warehouse Receipts. (ECF No. 177, PageID 2615.) However, O'Connor visited

Houston and allegedly confirmed that at least 20% of Kirby's tires were there. (ECF

No. 195-1, PageID 9525.) Genuine disputes of material fact thus exist and summary

judgment on Kirby's Warehouse Receipt breach of contract claim is improper. This

aspect of XPO's Motion for Summary Judgment is **DENIED**. (ECF No. 177.)

### 4. Negligence

Count Eleven focuses on Kirby's negligence claims which take three forms:

negligent misrepresentation, negligent execution, and negligent hiring/supervision.

Specifically, Kirby alleges that Baltagi negligently misrepresented to Kirby that: (1)

"he would store and release Kirby's OTR Tires on behalf of Kirby with knowledge

that OTR Tires to be purchased were on site and owned by parties other than the

purported seller, Mid America [Tire]"; (2) Kirby would own most of the 300 to 400 OTR tires at XPO Houston; and (3) "Adkins, Neidik, Midwest Coal, and L.A.D. were trustworthy and that XPO had previously conducted business with both individuals and both companies." (ECF No. 91, PageID 1143-1144 ¶ ¶ 153-155.) Kirby further alleges that Baltagi negligently executed the Warehouse Receipts. Finally, Kirby asserts that XPO negligently hired, retained, and supervised Baltagi. (ECF No. 91, PageID 1144, ¶ ¶ 156, 161; ECF No. 183, PageID 4125 n.41.) XPO seeks judgment on all negligence counts.

XPO makes broad arguments urging dismissal—scope of employment and lack of duty—without delineating which negligence claims those contentions pertain to. The former was found to be a question of fact *supra*. Thus, XPO's basis for judgment relies upon a lack of a duty on the part of XPO/Baltagi. "The existence of a duty in a negligence action is a question of law for the court to determine." *Mussivand v. David*, 45 Ohio St. 3d 314, 318, 544 N.E.2d 265, 270 (1989) (citation omitted).

"A defendant is liable for negligent misrepresentation if he (1) supplies false information (2) for the guidance of others in their business transactions (3) causing pecuniary loss to the plaintiff (4) while the plaintiff justifiably relied upon the information (5) and the defendant failed to exercise reasonable care or competence in obtaining or communicating the information." *Doe v. SexSearch.com*, 551 F.3d 412, 418 (6th Cir. 2008) (citing *Delman v. City of Cleveland Heights*, 41 Ohio St. 3d 1, 534 N.E.2d 835, 838 (Ohio 1989)). A negligent misrepresentation claim requires

"a special relationship under which the defendant supplied information to the plaintiff for the latter's guidance in its business transaction." *Ziegler v. Findlay Indus., Inc.*, 464 F. Supp. 2d 733, 738 (N.D. Ohio 2006).

The Court finds *supra* in Section IV(B)(1)(b) that XPO sustained its burden of demonstrating that Kirby lacks evidence to support a finding of justifiable reliance and further holds that Kirby failed to present evidence that establishes a question of fact as to its justifiable reliance burden. And, Kirby fails to allege or argue the existence of any "special relationship" between itself and XPO/Baltagi, so XPO did not owe Kirby any duty.  Consequently, the Court **GRANTS** XPO's Motion for Summary Judgment on Kirby's negligent misrepresentation/execution claim. (ECF No. 177.) *See SexSearch.com*, 551 F.3d at 418 (holding similarly).

The elements of negligent hiring, retention, and supervision are: "'(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employer's act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries.'" *Morway v. Ohio Bureau of Workers' Comp.*, Ct. of Cl. No. 2003-10198, 2011-Ohio-7027, ¶ 23 (quoting *Peterson v. Buckeye Steel Casings*, 133 Ohio App.3d 715, 729, 729 N.E.2d 813 (1999)). "It is axiomatic that a claim of negligent hiring, supervision, and retention against an employer is not viable without an underlying act of negligence by an employee that causes injury or loss." *Morway*, 2011-Ohio-7027, ¶ 23 (citing *Lehrner v. Safeco Ins./Am. State Ins. Co.*, 171 Ohio App.3d 570,

2007 Ohio 795, ¶ 42, 872 N.E.2d 295 (2nd Dist. 2007)). Because the Court grants judgment in XPO's favor on the negligent misrepresentation/execution claim, Kirby's negligent hiring, supervision, and retention claim fails as a matter of law pursuant to *Morway* and *Lehrner*. XPO's Motion for Summary Judgment on the negligent hiring, supervision, and retention claim is **GRANTED**. (ECF No. 177.)

### 5. Civil Conspiracy

Count Thirteen is for civil conspiracy. (ECF No. 91, ¶ ¶169-174, PageID 1145-1146.) "A civil conspiracy claim requires an underlying tortious act that causes an injury. Thus, if there is no underlying tortious act, there is no actionable civil conspiracy claim." *Doane v. Givaudan Flavors Corp.*, 184 Ohio App. 3d 26, 2009-Ohio-4989, ¶ 32 (1st Dist.). For XPO to achieve summary judgment on this count, its motion for summary judgment on the fraud count had to be successful. It was. Hence, XPO's Motion for Summary Judgment on Kirby's civil conspiracy count is **GRANTED**. (ECF No. 177.)

## V. CONCLUSION

XPO's Motion to Partially Exclude Expert Testimony of Evan Armstrong is **GRANTED** in part and **DENIED** in part. (ECF Nos. 178, 198.)

Kirby's Motion for Partial Summary Judgment to Apply Pennsylvania law to the fraud and any respondeat superior analysis is **DENIED**. (ECF No. 181.)

XPO's Motion for Summary Judgment (ECF No. 177) is **GRANTED** as to Kirby's fraud, breach of contract (Client Services Agreement), negligence, and civil conspiracy claims. XPO's Motion for Summary Judgment (ECF No. 177) is

**DENIED** as to Kirby's RICO and breach of contract (Warehouse Security Letter) counts.

Plaintiff shall file a status report detailing the bankruptcy status of the remaining defendants and Plaintiff's intention regarding its claims against each within ten (10) days of this Opinion and Order.

**IT IS SO ORDERED**.

/s/Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**